JOHN CAHILL, APPELLANT, V. ROBERT S. MOCKETT, EXECUTOR, ET AL., APPELLEES.

10 N. W. (2d) 679

FILED AUGUST 6, 1943. No. 31531.

*O. B. Clark,* for appellant.

*Mockett & Finkelstein, Thomas M. Davies* and *Herman Ginsburg, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER and WENKE, JJ.

MESSMORE, J.

This is an action for specific performance of a contract. The court found and decreed: (1) That the plaintiff did not prove by clear, competent and satisfactory evidence the contract alleged; (2) that, had the plaintiff proved that a contract was entered into, then and in that event the plaintiff has breached it and has wholly failed to perform it. From these findings and decree, plaintiff appeals.

The pleadings establish that Robert S. Mockett is the executor of the estate of Margaret Sheehy, deceased, who died on April 17, 1940, a resident of Lancaster county, Nebraska; that on May 24, 1940, her last will and testament was admitted to probate in the county court. No appeal was taken.

In his second amended petition plaintiff alleged a written contract, evidenced by letters written by Margaret Sheehy. The substance of the contract pleaded is as follows:

On or about October 1, 1902, Margaret Sheehy and James Sheehy, her husband, were engaged in the monument business in Lincoln, Nebraska. Margaret Sheehy, in writing, represented to Thomas and Johanna Cahill, plaintiff's parents, for his benefit, that she was unable to bear a child, and, if plaintiff's parents would permit him to come to her home and he would come, she would receive him into her own family as her son and sole heir, teach him the monument business, continue to treat him as a son and sole heir and bestow upon him absolutely all her life savings, property and estate, acquired and accumulated during her lifetime, to be his upon her death. Plaintiff's parents, for his benefit, accepted the terms of the agreement and permitted him to leave his home in Ireland to come to the home of his aunt, Margaret Sheehy, in Lincoln, Nebraska. Plaintiff came to the home of his aunt in Lincoln, was received by her as her son and sole heir, became one of her family, and for many years worked in the monument business to her profit, without compensation other than his board, room and clothing. From the time he entered the home of his aunt up to the time of her death, he treated and cared for her,

and attended to her wants and needs as though she were his mother, looked after her welfare and happiness, performed each and all of the terms of the agreement by him to be performed. From and after he came to Lincoln his aunt frequently and repeatedly stated orally to the plaintiff and divers other persons, in the presence of the plaintiff, that she had made the contract and plaintiff had performed and carried out all the terms of the agreement.

The answer of defendants Martin and of the executor specifically denied the making of any such agreement; that if it was made plaintiff failed to perform the terms thereof, and any service he may have rendered his aunt had been fully paid. The reply was a general denial.

The record discloses without dispute that Margaret O'Connor was born in Listowel, County Kerry, Ireland, October 14, 1863, came to America in 1880, married James F. Sheehy in 1884. He was engaged in the monument business at Twentieth and O streets in Lincoln, Nebraska; he died March 24, 1910. The plaintiff came to Lincoln to his aunt's home in April, 1903, and lived with her until 1906, then boarded and roomed away from her home, receiving $7 a week to be expended for his living. On April 5, 1910, plaintiff married, after which he received $15 a week as wages. In June, 1910, he and his wife went to Ireland on money that the wife had saved. He stayed about three months, and his wife remained until June, 1911. Upon plaintiff's return he stayed with his aunt until March, 1911, when he was employed by the Burlington railroad, continuing in this employment until 1913, when he and his wife moved to California, where he worked for a warehouse company. In 1917, he moved to Cleveland, Ohio, where he worked as a pile driver, receiving the average wage of $400 a month. He returned to Lincoln in 1929, was employed by the Burlington railroad from September of that year until March, 1930. He was then employed by the Lincoln fire department where he worked for four years. Thereafter, he became a salesman for a monument company in Sioux City, Iowa, and later worked in the same capacity for an Omaha firm.

January 3, 1917, the aunt purchased and furnished a residence at 945 South Fourteenth street, Lincoln. From and after that date until her death, she owned and occupied the same as her home, using a part of the premises for roomers. In 1934 the aunt made a will, which contained certain charitable bequests to her church. She devised her home to the plaintiff and made certain bequests to her living sisters and the children of her deceased sisters. Later in 1934 she destroyed this will by tearing it up in the presence of her attorney in his office, and on October 12, 1934, she executed a new will, making certain specific bequests, providing for her sisters and the children of any deceased sister and leaving out the plaintiff. July 1, 1936, she added a codicil to her will in which she devised a life estate in her home property to a niece, Mamie Drysdale Martin, one of the defendants, and the remainder title she devised to the niece's children. In June, 1934, she purchased at auction a house at 2147 C street, Lincoln, and on January 7, 1935, executed and delivered a deed to this house to the plaintiff. On March 11, 1940, the aunt executed and delivered a deed to the home property to Mamie Martin, and on March 18, 1940, assigned to Mamie Martin and her husband what is referred to in the evidence as the Novicoff mortgage.

The plaintiff contends that the court erred in holding that the evidence was insufficient to prove the contract. The plaintiff testified he was born in Listowel, County Kerry, Ireland, October 4, 1884; that he was 19 years old when he came to this country and went to work for his aunt, received pocket money in the sum of $5 a month and wore the cast-off clothing of his uncle; that he worked long hours and became proficient as a marble cutter. The going wage of an apprentice did not exceed $1 a day, and the average wage of marble cutters was $4 a day. Before his marriage, his sister Minnie approached the aunt to prevail on her to pay him wages. The aunt refused, saying that he could not be paid wages at that time; that he had been given a promise he would receive all her property at her death. Upon his return to Lincoln in 1929 he moved, at the aunt's re-

quest, into a home near her and subsequently moved into the property on C street. With reference to the C street property, it was purchased at auction for an amount approximating $1,125. Plaintiff testified that upon examination of the premises at the time it was purchased he found it was not livable; that he and his wife, by their work and in making repairs, expended an amount equivalent to $500. He mortgaged the property for $1,500 and sold it a week prior to trial for $2,400. The aunt paid for repairs, as shown by checks in evidence. In conversations with various witnesses the aunt said she had purchased this property and repaired it so that the plaintiff could rent rooms for an income and live in part of the house as a home; that it was a gift to him.

Various witnesses, who lived in close proximity to the aunt at the time the plaintiff came into her home and went to work at the monument works, testified that the aunt had told them on different occasions that she had sent for the plaintiff to come from Ireland to her, live with her as a son, learn the monument business, and that he would be treated as a son; that she was unable to bear a child, and that she had sent passage money and traveling expenses and he was to be her sole heir and entitled to all the property that she had accumulated during her lifetime; that all of such property was to be his upon her death. These conversations are similar in the language used, and a separate recitation of each would unnecessarily lengthen this opinion. They cover a period of approximately 40 years, and most of the witnesses were old acquaintances of the aunt who knew the plaintiff. These witnesses likewise testified that the plaintiff worked hard at the monument works, became proficient as a marble cutter, was attentive to the aunt and looked after her welfare and happiness. There is further testimony of witnesses to the effect that they saw plaintiff doing various kinds of work in and about the aunt's home after he returned from Cleveland,—such as repairing, painting, looking after the rooms and generally keeping up the premises, both inside and out; that he was attentive to his aunt;

she had repeatedly said he was to have that home as his and had made it so all he would have to do would be to walk in and take possession at her death.

Persons, who roomed at the aunt's home after the plaintiff's return in 1929 until her death, testified that they did not see the plaintiff in or about the premises, doing any work, and that he was seen there only on one or two occasions during the last week of his aunt's illness and at the time of the funeral; that other persons were employed to care for and nurse the aunt during her last illness. One of plaintiff's daughters testified, in substance, to a letter, sent to her father in Cleveland by the aunt, in which she informed the plaintiff that she needed him; that she had a large house and roomers, and that he should come back and care for her; that he had a great interest in coming back because all of her property would be his at her death. One of plaintiff's daughters who helped and assisted the aunt was sent to business school by her; another daughter was sent by her for a short time to the university.

The plaintiff testified as to the substance of the letters written by the aunt to his parents and their reply, the original letters or copies thereof not being in evidence. His version follows:

"Dear Brother and Sister: I and my husband James is in the monument business in Lincoln, Nebraska. We are in need of some help, and your oldest son John ought to be the right age to learn the trade. If you leave him come out to us, I and my husband have agreed and will promise that we will take him into our home as our own son, and any property or money we should accumulate in years to come will be his at our death." Other parts of the letter, testified to by plaintiff, need not be quoted. The reply to the letter was to the effect that they (plaintiff's parents) "were willing to let John come out to her under those conditions." The contents of the second letter, as the plaintiff testified he remembered it, stated that "she was glad that I was going to come out to her, and to rest assured that I would get the proper care; that she would take me into her home as her

own son and future heir, and to have me come right away. Enclosed in that letter, also, was a passage ticket, paying my way from Listowel to Lincoln, Nebraska, and * * * check for $20 for expense money."

Mamie Martin, the recipient of the home property and the assignee of the Novicoff mortgage, testified to her acquaintance with the aunt, and that during her last illness the aunt, in writing, sent for her to come and care for her, which she did; that her husband was out of employment, came later and assisted in keeping up the aunt's home. She testified to the care she had given her aunt and to the conversations with the aunt, wherein she was promised the home place and the other property which she received. The transaction with respect to the property so received by the niece was testified to, as being the aunt's wish and desire, by her attorney, his secretary and others. Mamie Martin likewise testified that she had had no difficulty with the plaintiff, had visited with him, and she denied certain conversations testified to by him, wherein the plaintiff told her that the aunt was giving him all of her property,—this in reference to the home property,—and the witness admitted she had known that before and had been told so by the aunt. The aunt's attorney and his secretary testified, in substance, that the aunt destroyed the will in 1934 because she had had difficulty with the plaintiff and said she was "through with him," and had given him enough when she gave him the house on C street, repaired it, and, in addition, had given him $550 to trade in his old car and purchase a new one, and he always wanted more. On this point the plaintiff and members of his family testified, in substance, that he was satisfied with his old car, but that it had been inconvenient for the aunt when he took her different places, and that she required him to get another car, paying the difference. The aunt told many witnesses that she kept her room locked and had denied the plaintiff admittance to her home. This situation seems to have been brought about by the plaintiff when he mortgaged the home on C street. He and his family explained the mortgaging of the home in that

when the aunt came for dinner on one occasion plaintiff explained to her the reasons for mortgaging the home, she agreed that it was right, and said that "a promise is a promise," and he still was to get all of her property at her death.

The executive of a trust company in Lincoln, who had transacted business with the aunt for more than 20 years, testified that she was a woman of good business judgment and he had had pleasant business relations with her, and that she had never at any time told him of any agreement with the plaintiff whereby she was leaving him all of her property. Witness was acquainted with the C street property and her purchase of it, and stated the aunt told him it was a gift from her to the plaintiff. The aunt's attorney testified that she had not told him, and he had never heard, of any arrangement whereby the aunt had agreed to give the plaintiff all of her property at her death, and that he had transacted business with her at various times from about 1920. He testified to the making of the wills, the codicil and the assignment, and that at the time they were executed the aunt was of sound mind, knew the objects of her bounty and directed the manner in which her property should be disposed of, and he complied with her desires; that the plaintiff had called on him, inquired what provision the aunt had made for him in her will, but the attorney refused to disclose it, and after the will was opened the plaintiff called again, was informed that he knew the contents of the instrument admitted to probate, and that the plaintiff seemed interested in obtaining orders for some headstones mentioned in the will, his explanation being that he wanted to make the headstones without charge, as he had great respect for his aunt.

An attorney, who represented the aunt at an earlier period, testified he had never heard of any such arrangement with reference to the aunt's property, or the contract. Her attending physicians, one of whom had known and attended her at different times for more than 30 years, testified to conversations had with the aunt about her property;

that she was a good business woman and alert, and the substance of this testimony is that she was going to give plaintiff some property. There is testimony by several witnesses that the aunt in various conversations told them how faithful Mamie Martin had been; that she had never asked for anything and that she was to receive the home property. The record is voluminous, and we have not attempted to set out all of the evidence, but have given a general summary thereof which we deem pertinent to the issues joined.

The plaintiff cites cases which hold that "Equity will grant specific performance of a parol contract to leave property to another, where the terms of the contract are established by evidence that is clear, convincing and satisfactory, and where it has been wholly performed by one party and its nonfulfilment would amount to a fraud on that party." *Craig v. Seebecker*, 135 Neb. 221, 280 N. W. 913.

In the case of *Overlander v. Ware*, 102 Neb. 216, 166 N. W. 611, this court held that "not only must the terms of the contract be established by evidence that is clear, satisfactory and unequivocal, but the work constituting the performance required under the statute of frauds must be such as is referable solely to the contract sought to be enforced, and not such as might reasonably be referable to some other and different contract or relation. Nothing will be considered as part performance which does not put the party into a situation which is a fraud upon him unless the agreement be fully performed. Equity interferes only to prevent fraud or unconscionable advantage."

Some of the conversations testified to with reference to the contract were had approximately 40 years ago and apparently were loose and casual. The supreme court of Iowa, in such a situation, has announced the conclusion that no species of testimony is more dangerous or received with greater caution. *Cooper v. Skeel*, 14 Ia. 578, 581. As applicable to the subject of proof of admissions of declarants, Corpus Juris Secundum, after a discussion of the obvious weakness of this class of testimony, states: "Exposed to

all the infirmities mentioned in the preceding section and to the further objection that it is impossible, in most cases, to convict the witness of perjury if his testimony is wilfully false, testimony as to the oral statements of deceased persons is therefore regarded as the weakest kind of evidence and subjected to the closest scrutiny." 31 C. J. S. 1018, sec. 266. In principle, our own authorities are in substantial accord with the above rule. See *Overlander v. Ware*, *supra*; *Williams v. Miles*, 68 Neb. 463, 94 N. W. 705; *Clark v. Turner*, 50 Neb. 290, 69 N. W. 843; *Johnson v. Kern*, 117 Neb. 536, 225 N. W. 38; *Goodwin v. Freadrich*, 135 Neb. 203, 280 N. W. 917.

In addition, the record discloses a letter written by the plaintiff to the aunt as follows:

"You can feel safe and rest assured that I will not bother you in your home again. However if at any time you should happen to need a friend or I can be of any service to you, you can feel free to call me at any time day or night. Yes I did put a mortgage on this place that you was kind enough to give me, and the proceeds from that was used for what I consider to be a very good purpose. Part of it was used to put a new roof on the house also a new furnace and a lot of other improvements on the inside. There was also a part of it used to educate my family. I send Elizabeth to the University for one year, then to business college until she graduated. She has now one of the best jobs in Omaha with the United States internal revenue dept. (temporary but we expect her to work in as a regular) Margaret is with the Home Owners Loan Corp. Catherine is on her last year at the university and will be out this fall. So I consider that money was well spent as we have a family that we feel is a credit to us. And I and their Mother's sole ambition is to be a credit to them also. I also helped my sister Katie who owing to an accident has been laid up for the past 4 years but is now well on her way towards recovery thank God. And I could not in her trouble forget my good sister Minnie (as she did not forget me years ago) when she buried her only son 25 years old

last summer. I am not trying to make any of these things any concern of yours. I just want to show that it is very little we waste or squander mortgage or no mortgage.

"I am making monthly payments on what I borrowed and if I succeed in getting the Contract I am after at present time, what I do owe will be paid off inside of three years. So don't be bashful in letting us know if there is anything I can do for you I will be very glad to do it and won't expect anything as anything I may do is paid for long ago."

It is apparent from the record that plaintiff lived with his aunt when he first came from Ireland, from 1903 to 1906. Thereafter, in 1907, he boarded out and still worked for his aunt. He married a week after his uncle's death in 1910 and went to Ireland for approximately three months. He returned and worked for the aunt for a short time until March, 1911. He then ceased to follow his trade and worked at various places and occupations, as hereinbefore set out, until 1929. He was away from the home of his aunt from and after 1911, and she disposed of the business in 1912. He lived in California and Ohio most of the time, returning to Lincoln in 1929. There is no evidence of correspondence with her during a period of a good many years, or any evidence to show in what manner he was looking after her welfare and interests, or in just what respects he considered her as a mother and she, in turn, considered him as a son. There is a conflict in the evidence as to just what he did in assisting his aunt after his return in 1929, or if he did anything to assist her. There is a conflict in the evidence as to just what provision she was to make for him, if any, and her business confidant and attorneys were not familiar with, nor had they heard of, such an agreement as contended for by the plaintiff. Her attending physician gained the impression that she was going to give plaintiff some property. In this connection, she purchased and put some repairs on the C street home, deeded it to plaintiff and his wife as a gift; she furnished $550 towards the purchase of a new automobile and provided some mon-

ey for educational purposes for two of plaintiff's daughters. She had difficulty with him and made statements that he wanted more of her property and wanted to take over the home place, and that she was unable to satisfy him, and she denied him admittance to her home. Most of the difficulty arose over his mortgaging of the C street property. He contended, as did the members of his family, that this matter was straightened out to her satisfaction, and that she said she had made the promise to give him all her property and was going to stay by it. This was an explanation of the letter heretofore set out. In reading this letter we can arrive at no other conclusion than that the plaintiff considered he had been paid for everything he had done and expected nothing more. This he stated specifically and indicated that he would be glad to render any service in the future for which the aunt would call upon him.

There is a conflict in the testimony as to his age at the time the contract was alleged to have been consummated. He testified he was 19 years old when he came to the United States. He signed a declaration of intention shortly thereafter that he was born October 4, 1881. If this be true, he would have been 21 years of age before leaving Ireland and competent to negotiate a contract with the aunt in his own behalf and avoid the necessity of his parents making it for him and for his benefit.

From an analysis of the record, it seems extremely improbable that a woman, of the aunt's business ability and shrewdness, would have entered into such a contract at the time alleged. It would be a most imprudent contract for such a woman to make under the circumstances; that is, to pledge her whole present and future estate in such a way. It would be reasonable and logical for her to promise to do well by the nephew, take him, help him and remember him, if he, in turn, had reciprocated and been faithful, but further than this no prudent woman would go under the circumstances. She did take him, help him and remember him. He suffered no detriment by coming to this country and apparently has been able, by his own ingenuity and

ability, to provide for his family and procure an education for his daughters, who obtained creditable employment.

"Appeals in equity are for trial *de novo* in this court, and it is the duty of this court to reach an independent conclusion with reference to the findings of the district court. But, when the evidence on material issues so conflicts that it cannot be reconciled, the court considers the fact that the trial court observed the witnesses and their testimony, and must have accepted one version of the facts rather than the opposite." *First Trust Co. v. Airedale Ranch & Cattle* Co., 136 Neb. 521, 286 N. W. 766.

We conclude that the evidence to establish the contract is not clear, satisfactory, convincing and unequivocal, as contemplated by the authorities *(Overlander v. Ware, supra; Craig v. Seebecker, supra; Goodwin v. Freadrich, supra)*, and that specific performance of the contract, which is sought to be proved by parol in the instant case, should be denied.

In a suit for specific performance, equity withholds or grants relief according to the circumstances of each particular case. *Kofka v. Rosicky,* 41 Neb. 328, 59 N. W. 788.

We are in further agreement with the court in that there has been a substantial failure of performance by the plaintiff in fulfilling the terms of the contract, if made. The rule is: In case an oral agreement to make a will is proved, specific performance of the oral contract will be enforced only where one party has wholly and the other party partly performed it, and its nonfulfilment on the one hand would amount to a fraud on the party who has fully performed. The agreement pleaded by the plaintiff in the instant case is tantamount to an oral contract to execute a will in his behalf, leaving him all of the property, real, personal and mixed, which the aunt would have at her death. See *Kofka v. Rosicky, supra; Gilgren v. Price,* 140 Neb. 124, 299 N. W. 325.

The plaintiff contends that the testimony offered by the defendants is a declaration against interest. and, as such, is ordinarily conclusive as against the party making it.

Evidence of self-serving declarations of a party, inconsistent with the declarations against interest, is incompetent and inadmissible and cannot be received to annul or explain away such declarations against interest; citing *Harrison v. Harrison*, 80 Neb. 103, 113 N. W. 1042; *Davis v. Murphy*, 105 Neb. 839, 182 N. W. 365.

There is no reason to dispute the correctness of the rule announced. However, the evidence by the defendants in the instant case, as to statements made by the aunt, was offered and received on the theory that such evidence was to prove that if such contract had existed the plaintiff wholly failed to perform it. It went solely to failure of performance of the contract by the plaintiff, and the evidence was admissible for such purpose.

Plaintiff further contends that the court erred in sustaining objections to certain interrogatories in the deposition of his sister, a resident of California. We have carefully examined the evidence of this witness and, considering it in its most favorable light, we can arrive at no other conclusion than that which is heretofore announced. In this connection, no citation of authority is necessary to disclose the incompetency of the affidavit furnished by plaintiff's mother, when her deposition could have been taken, and preparation was made to do so.

We are further convinced from an examination of the record that it is barren of any evidence showing that the aunt was mentally incompetent, through old age, illness, or otherwise, to transact her business, and a discussion of this assignment of error is not necessary.

For the reasons given in this opinion, the judgment of the trial court is affirmed.

AFFIRMED.