RAYMOND RUSH ET AL., APPELLANTS, v. FRANK C. HEINISCH, SPECIAL ADMINISTRATOR OF THE ESTATE OF KRIST ANGELOFF, DECEASED, ET AL., APPELLEES.

60 N. W. 2d 608

Filed October 23, 1953. No. 33381.

*Kennedy, Holland, DeLacy & Svoboda, J. A. C. Kennedy, Jr.*, and *Beavers' Law Firm*, for appellants.

*Clarence S. Beck*, Attorney General, *Richard H. Williams*, and *George Evens*, for appellees.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action for specific performance of an alleged oral contract to convey property made between the plaintiffs and Krist Angeloff, now deceased. The defendants, among others, are the administrators of the estate and the State of Nebraska, because of the laws as to escheated estates. The trial court denied performance and dismissed plaintiffs' petition with prejudice. Plaintiffs filed a motion for a new trial which was overruled. Plaintiffs appeal. We affirm the judgment of the trial court.

The plaintiffs are the sons of Ava Angeloff by a previous marriage. Plaintiffs' mother, hereinafter called Ava, married Krist Angeloff, hereinafter called Krist, in May 1937. Thereafter Ava lived with Krist in Omaha and the plaintiffs continued to reside with the grandmother in Iowa. There is evidence that Ava thereafter acquired an equitable interest in two vacant lots in South Omaha. This is challenged, but it is quite apparent that Krist thought she had such an interest. She died intestate on January 2, 1943. Her estate does not appear to have been probated.

Krist, prior to his marriage to Ava, owned a home adjoining the two lots above referred to. At the time of his death he possessed an estate in real and personal property appraised at above $23,000. He had not remarried. He at all times maintained friendly relations with plaintiffs, their families, and their grandmother. They visited in each others' homes. Krist on a number of occasions gave gifts to plaintiffs, their wives, and their children. No will of Krist has been found. His estate is being probated as an intestate one.

Plaintiffs alleged: "That subsequent to the death of the said Ava Angeloff, to wit: the 15th day of March, 1943, the plaintiffs and the said Krist Angeloff entered

into an agreement, the terms of which were as follows: that plaintiffs transfer to him, the said Krist Angeloff, all right, claims and title which they had in and to the said property descending to them through the said Ava Angeloff as aforesaid, and in consideration thereof the said Krist Angeloff promised and agreed that he would at his death vest plaintiffs with all his estate and would by his last will and testament make plaintiffs the sole beneficiaries therein.

"That plaintiffs performed fully that part of said agreement obligatory upon them to perform in this, to wit: that plaintiffs, pursuant to their said agreement with the said Krist Angeloff and in consideration of his promise to leave his entire estate to them alone when he died, did on the 15th day of March, 1943, execute and deliver deeds whereby plaintiffs conveyed and released to the said Krist Angeloff all their rights, title and interest in lands descending to them from the said Ava Angeloff and did orally release to the said Krist Angeloff all their rights, title and interest in and to the personal estate of Ava Angeloff.

"Plaintiffs further state that although plaintiffs fully performed the contract made with the said Krist Angeloff as aforesaid, yet the said Krist Angeloff completely failed to perform that part of said agreement obligatory upon him to perform; that the said Krist Angeloff failed to make and execute his last will devising his property both real and personal to plaintiffs as he had agreed; that the said Krist Angeloff did not leave to plaintiffs all his estate or any part thereof as he promised plaintiffs, in consideration for their conveyance and transfers aforesaid.

"WHEREFORE, PLAINTIFFS PRAY THE COURT that it specifically enforce the agreement between the plaintiffs and the said Krist Angeloff, deceased, and that the Court decree that plaintiffs have the property of which the said Krist Angeloff died seized, for the same purpose and with the same force and effect as if they had

been named sole beneficiaries in a last will and testament duly and properly executed by the said Krist Angeloff."

The state and the administrator joined issue on these allegations. The cause is here for trial de novo as to those issues.

The plaintiffs will be referred to by their first names of Raymond and Lewis.

We find no evidence that plaintiffs orally released their title to the personal property of Ava.

On March 15, 1943, Raymond and Lewis, by separate instruments, deeded to Krist their interest in the two lots, in which they claim their mother had an equitable interest. These deeds were delivered at that time. The recited considerations were "One Dollar and other valuable considerations." The grantors were minors at the time of the execution and delivery of the deeds.

The first question here is the sufficiency of the evidence to prove the alleged contract under the long-established rule that: "Where a party seeks specific performance of an oral contract for the conveyance of land of a deceased person, the burden is on such person to prove an oral contract, the terms of which are clear, satisfactory, and unequivocal and that the acts of part performance in relationship to the subject matter in and of themselves are such as are referable solely to the contract sought to be enforced and cannot be accounted for on any other reasonable hypothesis." Nelson v. Glidewell, 155 Neb. 372, 51 N. W. 2d 892.

The evidence is subject to the further rule that testimony as to the oral statements of deceased persons is regarded as the weakest kind of evidence and subject to the closest scrutiny. Cahill v. Mockett, 143 Neb. 730, 10 N. W. 2d 679.

It is undisputed that on the 14th day of March 1943, Krist appeared at the home in Iowa. He had the deeds to these two lots prepared at that time. The evidence of an uncle of plaintiffs is that Krist talked to him and

to Raymond, the younger of the plaintiffs, at that time. The uncle testified that Krist said he had some papers he wanted the boys to sign; that Raymond asked about the nature of the papers and was told that they were to some lots in Omaha; and that "He told Raymond why he wanted them signed. He said that they had an interest in their mother's property, if they turned that over to him, then, why, they would get it all eventually when Kris died." Lewis, the older of the two plaintiffs, lived at Eldora, Iowa. The uncle, the grandmother, Raymond, and Krist the next day drove to Mount Ayr and went to a lawyer's office where Raymond signed and acknowledged the deed. They then drove to Eldora where Lewis signed and acknowledged the deed. The uncle testified that on the way to Eldora, "He (Krist) talked about the boys signing over their interest in the property there, signed it over, that would not make no difference, they would get it back in the long run." The uncle also testified that Krist told Lewis: "He said that if they would sign the deed then they would get it all when he died * * *"; and that it was the same conversation about it. This is substantially the only evidence we find as to what Lewis was told.

Although the grandmother testified that she was with Krist and the boys all of this time at Mount Ayr, Eldora, and at home, she does not testify as to having heard any such conversations. It is also to be noted that in this testimony of the uncle the "get it all" and "it" obviously relate back to "their mother's property." We find no evidence that any other property of Krist had been mentioned at that time. It is then to be noted that this is a distinctly different subject matter than Krist's "entire estate" which they now claim it was agreed they were to receive.

The grandmother was with Krist and Raymond on the trip to Mount Ayr and Eldora. She was in the lawyer's office at Mount Ayr. She signed both deeds as a witness. We find no testimony from her as to what Krist

said until after these transactions were closed. She was asked what Krist said as to what "the boys had given him and what he was doing for them?" She answered, "He said the boys signed away their mother's rights, but he said the boys will get what I have got when I am through with it, when I am dead."

The lawyer who made the notarial acknowledgement on the deed from Raymond was called and testified as a witness for the plaintiffs. He knew all of the parties who came to his office. Krist told him he had a deed that Raymond was to sign and that he (Krist) wanted it acknowledged. The lawyer told Krist the deed would be of no validity because Raymond was a minor. Krist said he knew it, but that " 'It would make it easier for me to handle the property,' * * * 'It don't make any difference because the Boys are going to get my property any way when I am through.' " Raymond told the lawyer he understood what he was doing, and he signed the deed which the lawyer acknowledged. There is here an entire absence of any words indicating a promise or agreement. Assuming, but not deciding, that these two statements may be construed to include all of Krist's estate when he died, plaintiffs' position reduces itself to a contention that Krist made such a binding obligation in consideration for what he was told were invalid deeds to plaintiffs' undetermined interest in two vacant city residence lots.

There is evidence of plaintiffs as to other transactions that should be mentioned. Shortly after Ava's death Krist showed Ava's ring and watch to the grandmother and said, according to the grandmother, "the watch and ring were the boys. * * * the one that got married first was to have his choice, that was the way he had his mind made up at that time, * * *." She testified that after Lewis was married Krist had slips of paper prepared. Lewis drew the paper "with the ring on it, so he told me to get the ring and give it to Lewis, and I did." Lewis' wife testified that "it was his wish that we

should have it because it was our mother's." This was at Christmastime in 1946. Krist told Raymond that he was to have the watch when he married, that he "would not want to give it to him until he got married." Raymond was married October 7, 1947, and his mother's watch was given to "us" at the following Christmas, according to the testimony of Raymond's wife. We find no evidence in the record to indicate that plaintiffs felt they had a contract right to this property. It was treated as a gift of Krist's property to Raymond and Lewis and their wives.

There is also the testimony of Lewis' wife that in May 1947, in Krist's home, he showed her linens and fancy things that were Ava's and he said, "those things would be ours when he was gone." Raymond's wife testified also as to linens, silverware, and toilet articles which in May 1947, were shown to her by Krist and that "He mentioned how he kept everything that she had, and that when he got through with it that it was to become the boys and ours, * * * to take good care of it, and see that it was kept that way."

There is here no reference to any outstanding agreement or promise that this property was to be plaintiffs' when Krist died—it is rather negatived.

With the exception of these personal items of Ava's we find no mention of Krist's real estate or of his considerable personal property ever having been mentioned or discussed with plaintiffs or their people. He expressed to them his wish as to that which had been the property of plaintiffs' mother—nothing more.

There is evidence, offered by plaintiffs, as to what Krist said at different times to close friends in Omaha. In 1949 he told one friend he did not want to sell his property until he reached retirement age, that then he might sell it and go to live with the boys, and "the boys was going to get what he had when he was through with it." About 3 weeks before his death in February 1950, a friend talked to him about "what he should do with his property, and he says, 'I don't have anything to

do, that the boys will get it when I die.'" Another friend testified that about 2 weeks before Krist died he talked to Krist about a will and he said, "he would do it, when he passed away, why, his step boys could have the money and his property." The witness repeated the "could have" on two other occasions. Another neighbor and long-time friend, whose property adjoined Krist's, testified that 2 weeks before Krist died Krist told him he wanted to put in 3 years more on his pension; that then he would like to go and live in Iowa or get one of the boys to live with him in Omaha; and that he was going to turn his property "over to the one that was going to be with him." The witness repeated that statement, then said, "he was going to turn everything he got to the boys." This same witness said that 2 years before Krist died, Krist told him that he would like to have it fixed up so that "the boys have what I got." The witness finally returned to his original statement that Krist said, "the one that is going to take care of him, he says, is the one that get the property." He repeated it two additional times.

Such is the evidence upon which plaintiffs seek a decree. The things said and done and the circumstances surrounding the transactions when the deeds were delivered do not in anywise establish a contract under the rules above stated. The things said and done by the plaintiffs and Krist subsequently do not show that either plaintiffs or Krist considered that such an agreement existed. Such a conclusion is negatived by plaintiffs' testimony.

One thing further should be mentioned. Defendants offered the brother of Krist's first wife as a witness. He testified as to a long-standing friendship with Krist; that Krist had discussed Ava's possible interest in the lots with him; that Krist asked what to do about it; that he suggested the desirability of securing deeds from the plaintiffs; and that Krist later showed him the deeds. Over objection he testified that Krist told him he bought

the boys out and that he gave each of them $50 for the deeds. The trial court after receiving the evidence told plaintiffs that the evidence had been received subject to a motion to strike and that they could make such a motion. Plaintiffs did not. Rather, plaintiffs offered evidence undertaking to impeach the witness on collateral matters and offered evidence of the grandmother that no consideration was given so far as she knew.

Plaintiffs filed a motion for a new trial. They did not therein assign the admission of the above evidence as error. Here they assign error for the first time.

The established rules are:

"In an equity case appealed to this court, if it is desired to review alleged erroneous rulings of the trial court as to the reception of evidence, a motion for a new trial must be filed and overruled in the district court." Nemetz v. Nemetz, 147 Neb. 187, 22 N. W. 2d 619.

"The purpose of a motion for a new trial is to enable the court to correct errors that have occurred in the conduct of the trial." Krepcik v. Interstate Transit Lines, 151 Neb. 663, 38 N. W. 2d 533.

In Humpert v. McGavock, 59 Neb. 346, 80 N. W. 1038, we made specific application of these rules to a motion such as the one we have here. We there held: "* * * no complaint of the ruling or decision was made in the motion for a new trial. Such motion not only does not contain the usual assignments of 'errors of law occurring at the trial,' but in no way challenged the attention of the court below to its rulings upon the admission or rejection of testimony; hence such rulings are not reviewable."

The evidence is here for consideration along with other evidence in the case.

The judgment of the trial court is affirmed.

AFFIRMED.

CARTER, J., participating on briefs.