**In the Matter of David H. BROWN, District Judge.**

**No. B–4229.**

Supreme Court of Texas.

June 27, 1974.

———

John L. Hill, Atty. Gen., Max P. Flusche, Jr., and Jay Floyd, Asst. Attys. Gen., Austin, for relator.

Jewell E. Abernathy, Roland Boyd, McKinney, Joe A. Keith, Paul Brown, Ralph Elliott, Sherman, for respondent.

PER CURIAM.

Section 1–a of Article V of the Texas Constitution provides for the removal or censure of any judge for "willful or persistent conduct, which is clearly inconsistent with the proper performance of his said duties or casts public discredit upon the judiciary or administration of justice; . . ."[1] Pursuant to this constitutional directive, the State Judicial Qualifications Commission has recommended to this court the removal from office of David H. Brown, Judge of the 29th Judicial District. Although we have concluded after a full examination of the record that there is evidence of censurable judicial misconduct on the part of Judge Brown, we do not consider this behavior to be so improper as to warrant the removal of Judge Brown from office as recommended by the Commission.

On May 6, 1971, the State Judicial Qualifications Commission instituted a formal investigation of Judge Brown's conduct in office. Pursuant to Rule 4 of the Rules for Removal or Retirement of the Judges,[2] the Commission issued a formal notice of proceedings to Judge Brown and requested this court to appoint a master to take evidence on the charges, as provided by Section 1–a(8) of the Texas Constitution. We appointed a retired district judge.

A hearing was held before the master and his findings of fact were presented to the Commission. By a preponderance of the evidence, the master found that Judge Brown had engaged in no conduct clearly inconsistent with the proper performance of his judicial duties or casting discredit on the state judiciary.

Dissatisifed with these findings, the Commission ordered the "examiner"[3] to file objections to the master's report as required by Rule 13. The Commission heard oral argument and, following consideration of the record and the report of the master, entered unanimous findings of fact and conclusions of law, finding Judge Brown guilty of misconduct on eight of the ten charges brought for the Commission's consideration by the examiner. The Commission also added a ninth charge in its findings. By the unanimous vote of its sitting members,[4] the Commission recommended to this court that Judge Brown be removed from his office as district judge.

I.

As this is the first removal proceeding instituted under Section 1–a of Article V of the Texas Constitution, the procedural aspects of the process should be clarified.

ALTERNATIVES OF THE JUDICIAL QUALIFICATIONS COMMISSION

After making an investigation of charges brought against a judge, the Commission has four alternatives.[5] First, the

---

1. Tex.Const., Art. V, Sec. 1–a(6), par. A, Vernon's Ann.St.:
   "(6) A. Any Justice or Judge . . . may, subject to the other provisions hereof, be removed from office for willful or persistent conduct, which is clearly inconsistent with the proper performance of his said duties or casts public discredit upon the judiciary or administration of justice; or any person holding such office may be censured, in lieu of removal from office, under procedures provided for by the Legislature."

2. All references to Rules unless otherwise specified are to the Rules for Removal and Retirement of Judges, Adopted and Promulgated by the Supreme Court of Texas (1966).

3. The Commission designated an assistant attorney general as examiner to investigate the charges and to present evidence before the master. Rules for Removal and Retirement of Judges, 1(e). The same assistant attorney general argued the cause for the Commission before this Court.

4. Judge R. C. Vaughn recused himself from all proceedings before the Commission involving Judge Brown.

5. Tex.Const., Art. V, Sec. 1–a(8):
   "(8) After such investigation as it deems necessary, the Commission may in its discretion issue a private reprimand, or if the Commission determines that the situation

Commission may reject the accusations made against the judge. Second, the Commission may issue a private reprimand. The third alternative open to the Commission is public censure. In this instance, the Commission removes the veil of privacy from the incidents under investigation and publicly announces its disapproval of the judge's misconduct by an order of public censure. Finally, upon the vote of at least five members, the Commission may recommend removal or retirement [6] by filing such recommendation in this court.[7] Such action does not of itself remove or retire the judge, but it is the necessary charge or accusation by which this court acquires jurisdiction of this final phase of the matter.

## ALTERNATIVES OF THE SUPREME COURT

Once the Supreme Court obtains jurisdiction over the proceedings by virtue of the Commission's recommendation, it also has four alternatives.[8] The first alternative is the total rejection of the Commission's recommendation. Second, the Supreme Court may order the judge's retirement, in some instances. The third alternative is an order of public censure. The fourth is an order removing the judge from office.

## EVALUATION OF THE EVIDENCE

■ This is not a criminal proceeding, since the function of the Judicial Qualifications Commission is not to punish but to maintain the high quality of the judiciary. In re Laughlin, 153 Tex. 183, 265 S.W.2d 805 (1954); McDaniel v. State, 9 S.W.2d 478 (Tex.Civ.App.1928, writ ref'd). Consequently, the charges against Judge Brown need not be established by proof beyond a reasonable doubt. Moreover, the decision is not one which is grounded upon substantial evidence which ' supports the Commission's recommendation. The burden to establish the charges against Judge

---

merits such action, it may order a hearing to be held before it concerning the removal, or retirement of a person holding an office named in Paragraph A of Subsection (6) of this Section, or it may in its discretion request the Supreme Court to appoint an active or retired District Judge or Justice of a Court of Civil Appeals as a Master to hear and take evidence in any such matter, and to report thereon to the Commission. If, after hearing, or after considering the record and report of a Master, the Commission finds good cause therefor, it shall issue an order of public censure or it shall recommend to the Supreme Court the removal, or retirement, as the case may be, of the person in question holding an office named in Paragraph A of Subsection (6) of this Section and shall thereupon file with the Clerk of the Supreme Court the entire record before the Commission."

6. Rule 17(b):
"(b) The affirmative vote of five members of the Commission who have considered the record and report of the master and who were present at any oral hearing as provided in Rule 14, or when the hearing was before the Commission without a master, of five members of the Commission who were present when the evidence was produced, is required for a recommendation of removal or retirement of a judge. If five votes, as de-

scribed, are not cast for a recommendation of removal or retirement, an order of dismissal shall be entered."

7. "Rule 20. Certification of Commission Recommendation to Supreme Court. Upon making a determination recommending the removal or retirement of a judge, the Commission shall promptly file a copy of the recommendation certified by the chairman or secretary of the Commission, together with the trancript and the findings and conclusions, with the clerk of the Supreme Court, and shall immediately send the judge notice of such filing, together with a copy of such recommendation, findings and conclusions."

8. Tex.Const., Art. V, Sec. 1–a(9):
"(9) The Supreme Court shall review the record of the proceedings on the law and facts and in its discretion may, for good cause shown, permit the introduction of additional evidence and shall order public censure, retirement or removal, as it finds just and proper, or wholly reject the recommendation. Upon an order for involuntary retirement for disability or an order for removal, the office in question shall become vacant. The rights of an incumbent so retired to retirement benefits shall be the same as if his retirement had been voluntary."

Brown was upon the examiner, and those charges had to be established by a preponderance of the evidence. See Geiler v. Commission on Judicial Qualification, 10 Cal.3d 270, 515 P.2d 1, 110 Cal.Rptr. 201 (1973); Niehaus v. Madden, 348 Mo. 770, 155 S.W.2d 141 (1941); Cahill v. Mockett, 143 Neb. 730, 10 N.W.2d 679 (1943); Rea v. Rea, 195 Or. 252, 245 P.2d 884 (1952).

■ We also need to determine the force and effect of the findings made by the master as well as the findings made by the Judicial Qualifications Commission. Section 1–a(8), Article V, Texas Constitution, settles this problem. It empowers the Commission to "recommend to the Supreme Court the removal, or retirement, as the case may be, of the person in question . . . ." It is the Supreme Court which makes the ultimate decision. The master can hear, take evidence and make a report to the Commission. The findings of the master as well as those of the Commission lead to a recommendation by the Commission, but the term "recommend" manifests an intent to leave the court unfettered in its adjudication. This court's constitutional responsibility cannot be abandoned by the delegation of the fact finding power to an administrative agency or the master. This court must make its own independent evaluation of the evidence adduced below. Geiler v. Commission on Judicial Qualification, *supra*.

Rule 21(d) authorizes this court, for good cause shown, to permit the introduction of additional evidence.[9] That rule does not mean, however, that matters may be informally added to the record by letters and memoranda addressed to the clerk or the court. In this proceeding there has been no motion that additional evidence should be adduced and there has been no showing of good cause. Some unsolicited items have been submitted for inclusion

within the record, but our deliberations have been based solely on the record developed before and submitted by the master and the Commission, the briefs and oral arguments.

## MATTERS IN ABATEMENT

■ Judge Brown raises several objections to the proceedings as a whole which require discussion. First, petitioner says that his re-election to his office after the commission of the things for which he was charged operates as a complete defense to any disciplinary action. He relies upon Article 5986, Vernon's Ann.T.C.S., which says:

No officer in this State shall be removed from office for any act he may have committed prior to his election to office.

Article XV, Section 7, of the Texas Constitution authorizes the Legislature to provide for the removal of officers for whom the modes of removal are not provided in the Constitution. This proceeding is authorized by the Constitution, and for that reason Article 5986 is not applicable. However, the spirit of that statute was applied to a proceeding to remove a judge pursuant to Article XV, Section 6, of the Texas Constitution in the case of In re Laughlin, 153 Tex. 183, 265 S.W.2d 805, 808 (1954). The rule was there stated:

"Neither may removal [of judges] be predicated upon acts antedating election, not in themselves disqualifying under the Constitution and laws of this State, when such acts were a matter of public record or otherwise known to the electors and were sanctioned and approved or forgiven by them at the election. This holding is in harmony with the public policy declared by the Legislature with respect to other public officials. Article 5986, R.C.S."

9. Rule 21(d):
"(d) The Supreme Court may, in its discretion and for good cause shown, permit the introduction of additional evidence, and may direct that the same be introduced before the master or the Commission and be filed as a part of the record in the Court."

The rationale for the doctrine is the sound reason that the public, as the ultimate judge and jury in a democratic society, can choose to forgive the misconduct of an elected official. Reeves v. State, 114 Tex. 296, 267 S.W. 666 (1924). The underlying basis for the principle is that the public can knowingly return one to office in spite of charges of misconduct. Public access to full information was the basis for this court's approval of the rule in *Laughlin, supra,* as appears from the portion quoted above. Matters of public record or matters which are otherwise known to the electors may be forgiven, says the opinion.

The measure of open disclosure to the public which is contemplated by *Laughlin, supra,* may be severely limited in the case of investigations of judicial misconduct, prior to the time the Judicial Qualifications Commission files a proceeding in the Supreme Court.[10] Up to that time, unless the acts complained of have otherwise become a matter of public record or known to the public, the Constitution preserves the confidentiality of the information. It was during this stage of the investigation that Judge Brown's re-election occurred. The master who was conducting hearings in this matter in 1972, admonished Judge Brown's opponent to respect the confidentiality of the charges against Judge Brown or risk a contempt citation. Hence, a question arises as to whether the voters were sufficiently aware of Judge Brown's misdeeds for the *Laughlin* rule to be invoked. However, in view of our decision not to remove Judge Brown, it is unnecessary for us to decide whether or not the acts complained of were so well known to the public, prior to institution of this proceeding, that the prior-term doctrine does or does not apply in this instance. It is enough for us in this case to hold that the doctrine does not apply with reference to a censure of a judge for an act committed during a prior term, whether or not his misconduct was a matter of public record or otherwise known to the public before his re-election.

■ Judge Brown also complains that the several roles of the Commission—that of investigator, prosecutor and judge—in the removal proceedings defeat the impartial due process hearing to which he is entitled. This same complaint has been considered and rejected in the context of federal administrative agencies and their investigatory-adjudicative roles. Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1947); Pangburn v. C. A. B., 311 F.2d 349 (1st Cir. 1962). Texas has made the same decision. Firemen's and Policemen's Civil Service Comm'n v. Hamman, 404 S.W.2d 308 (Tex.1966). Other states with similar removal proceedings have also rejected this due process complaint. In re Kelly, 238 So.2d 565 (Fla.1970), cert. denied 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971), rehearing denied 403 U.S. 940, 91 S.Ct. 2245, 29 L.Ed.2d 720 (1971); In re Judge Edward A. Haggerty, 257 La. 1, 241 So.2d 469 (1970). It should be emphasized that the Commission is not authorized to remove a judge. The Commission can only recommend removal to the Supreme Court, which will consider the arguments and evidence of both sides without attaching any presumption to the findings of the Commission. Any alleged partiality of the Commission is cured by the final scrutiny of this adjudicative body.

## II.

## ON THE MERITS

■ The Commission found that Judge Brown was excessively absent from his

---

10. Tex.Const., Art. V, Sec. 1–a(10):

"(10) All papers filed with and proceedings before the Commission or a Master shall be confidential, and the filing of papers with, and the giving of testimony before, the Commission, Master or the Supreme Court shall be privileged; provided that upon being filed in the Supreme Court the record loses its confidential character."

court during a ten-month period between February 1 and November 30, 1969; that he too readily found persons in contempt of court and injected himself into the affairs of the county attorney and district attorney; that on one occasion during August, 1970, he conducted a brief hearing concerning an accused felon without notification to the accused's attorney; that during December, 1970, he conducted a second hearing with the same accused felon and tried to persuade him to plead guilty, which hearing was also held without notice to the attorney; that during June, 1970, he authorized the electronic interception of conversations between an accused felon and his attorney; and that while acting as Independent Executor of the Kern Estate, he failed to include in the inventory of the estate his own personal promissory note which he owed the estate.

The Master received testimony for approximately two weeks. He heard a very large number of witnesses including some seventy-three lawyers who practiced before Judge Brown in Collin and Grayson Counties; i. e., in Sherman and McKinney, Texas. Some ten attorneys gave testimony adverse to Judge Brown. The testimony of three or four was bitter; some of their testimony was addressed to Judge Brown's absence from the county during his arbitration activities, but most of these witnesses had other problems with Judge Brown.

On the other hand, some fifty-eight attorneys testified favorably of Judge Brown. These included the President of the local bar association, the President of the Dallas Criminal Bar and the Chairman of the State Bar's Section on Criminal Law. Several testified that Judge Brown was always available; that they never had any trouble getting in touch with him; that they had no trouble getting settings of their cases; that Judge Brown not only kept up with his docket but moved it ahead; that he did not unduly push lawyers practicing before him; that he was

industrious, studious, impartial, diligent, courteous, dignified, punctual, and efficient. Others added that he was "coldly efficient" but fair; that he ran a "good tight court;" that he started his court at 8 a. m., worked hard, and made the lawyers "hustle;" that he expected the lawyers and others to be present on time and prepared; and that the court room decorum was excellent.

Removal from office is not the price exacted for every judicial mistake and misdeed. Appellate courts through their review of proceedings afford correctives in most departures from judicial standards. It is the willful or persistent misconduct with which we are here concerned. Judge Brown's use of his contempt powers, his lectures to the county attorney and district attorney concerning the conduct of their offices, and his conducting two hearings in the absence of the accused person's counsel were improper, but are not acts which justify disciplinary action. We refuse to discipline Judge Brown with respect to the Kern note, since the misconduct charged as to the note was not proved by a preponderance of the evidence.

As the matter reaches us, there are two main areas of concern as to Judge Brown's conduct—his serving as an arbitrator or mediator for extended periods of time and his authorization of electronic surveillance [bugging] of a conference room for the purpose of recording conversations between a person accused of a crime and his attorney.

## ARBITRATION ACTIVITIES

At the time Judge Brown acted as a mediator or arbitrator, his conduct was not an improper act in itself. If he had acted as a mediator only once, or only in isolated instances, probably no complaint would have been filed against him, because acting as mediator or arbitrator was not then a violation of any canon of ethics. Since that time, the Code of Judicial Conduct of the American Bar Association has been

amended to provide that "A judge should not act as an arbitrator or mediator."[11] This court now has before it the question of whether Texas should adopt a similar canon.[12]

The commentary under the American Bar canon recognizes that valuable services have been rendered in the past by judges appointed to undertake extra-judicial assignments. It states that, "The appropriateness of these assignments of judges must be reassessed, however, in the light of the demands on judicial manpower created by today's crowded dockets . . . ."[13]

Before the effective date of the revision of the American Bar Association's canons, Judge Brown had voluntarily ceased to act as an arbitrator. He has not done so since 1970, so the real question is whether Judge Brown, in acting as an arbitrator or mediator, so neglected the work of his court, or was absent from it for so great a time, as to be guilty of willful or persistent conduct which was clearly inconsistent with the performance of his duties or which cast discredit upon the judiciary.

The fact that Judge Brown was paid for his work as a mediator is relevant but not controlling. The problem of flagrant and extended neglect of judicial duties would be the same if the judge absented himself, or did not properly attend to his duties, for any number of reasons, or for no reason at all. The evidence, therefore, which is set out below is relevant as to whether the judge properly attended to his duties or so absented himself as to warrant removal or censure.

Judge Brown testified, without dispute, that the major portion of the arbitration work consisted of the reading of briefs and written records. He testified that he did a good deal of this at home after hours, at night, and on weekends, and that many of the "full days" for which he received pay as an arbiter were spent in such work.

Judge Brown also was out of his district and out of the State for a number of days. A dispute apparently exists as to how many. The Master found that Judge Brown was absent from his court for a total of forty-seven days during 1969 and 1970. This is a substantial amount of time, and the Judicial Qualifications Commission was understandably and commendably concerned. The problem, however, is whether Judge Brown absented himself, or neglected his court and his judicial duties to the extent that his conduct amounts to "willful or persistent conduct which is clearly inconsistent with the performance of his said duties . . .."

It is a good rule that a judge should give his full working time to his court and to such other judicial duties of the State of Texas to which he is assigned and which he accepts. From a preponderance of the evidence and under all the circumstances in this record, however, the conduct of Judge Brown in acting as an arbiter or mediator was not such as to merit his removal or public censure; and he did not neglect the work of his court, in acting as arbiter, to such a degree as to require disciplinary action.

ELECTRONIC SURVEILLANCE

The incident about which there was the most controversy in the hearing before the Master was the electronic surveillance of a criminal defendant and his lawyer. A defendant was accused of murder and was in the local county jail. Two explanations of what occurred were given, one by the sheriff and one by Judge Brown. They do not agree in important particulars. According

---

11. Canon 5E, Code of Judicial Conduct, American Bar Association, 1972.

12. The Judicial Section of the State Bar of Texas has recommended that this court promulgate an amended Code of Ethics for the Texas judiciary. Partly because of the pendency of Judge Brown's case, the court has not yet acted on this recommendation.

13. Commentary under Sections E, F and G of Canon 5, *supra*, note 11.

to the sheriff, the accused had told him that he wanted to tell the sheriff about the murder, whereupon the sheriff instructed the prisoner to cease talking to him when his attorney was not present. The sheriff said he was disturbed about the jail security and the possibility of attempted suicide by the prisoner. The sheriff asked Judge Brown's permission to record a conversation between the prisoner and his parents to see if the prisoner planned suicide, but the sheriff said he did not intend to intercept any conversation between the accused and his attorney.

Judge Brown testified differently. He said that he had information that the prisoner wanted to plead guilty, but that his court-appointed attorney would not permit such a plea. Judge Brown's testimony was that he wanted to ascertain "whether the boy was being properly represented, whether he was telling the truth to the officers." Judge Brown said that he so told the sheriff, but the sheriff did not recall the conversation. The accused prisoner testified in this hearing, that outside the presence of the accused's attorney, Judge Brown had tried to persuade him to plead guilty; that he did not want to plead guilty, and that the sheriff also tried to get him to plead guilty.

Judge Brown authorized the sheriff to use a tape recorder to monitor the prisoner's statements. The recorder was set up for use on a Saturday when the family of the accused would be expected to visit the accused. The family came and so did the accused's attorney. All were taken to the room where the equipment was in place and was already running so that it could not be turned off. The sheriff testified that he had not expected the attorney to come with the family. The tape recorder did not operate properly and nothing audible was recorded. The next Saturday the same persons came to see the accused and

again the equipment was in place and again nothing audible was recorded.

There was no suggestion that the attorney was about to commit any criminal offense for, or with, the accused. No matter of jail security was involved under Judge Brown's testimony.

There were a number of accusations by attorneys antagonistic to Judge Brown that he was, in effect, trying to take over "law and order" in his district; that he had said that he was the "chief law enforcement officer" in the county, and that he was going to reduce the crime rate. This was strongly denied, and there was substantial testimony to support the negative of the assertions. There was also testimony that Judge Brown was trying to protect the prisoner from a more severe penalty by being sure that if the prisoner wanted to plead guilty, his lawyer should not keep him from doing so. Judge Brown testified that this was his motivation.[14]

Though a preponderance of the evidence establishes Judge Brown's improper authorization of electronic eavesdropping, we conclude upon review of the record that this misconduct does not warrant our ordering his removal from office. We recognize, however, that Judge Brown in ordering the surveillance willfully committed misconduct by intruding his judicial role into the confidential relations of an accused and his attorney. This conduct was also overt evidence that Judge Brown improperly confused his judicial functions with those of the law enforcement agencies.

Judge Brown should be reprimanded, or to use the constitutional term, he should be and is censured.

Concurring opinion by DANIEL, J.

Dissenting opinion by REAVLEY, J., in which WALKER, J., joins.

---

14. The prisoner received a death penalty. That conviction was reversed. Easley v. State, 493 S.W.2d 199 (Tex.Cr.App.1973).

On the second trial, Easley received a sentence of 300 years.

Dissenting opinion by SAM D. JOHN-SON, J.

DANIEL, Justice (concurring).

I concur in the majority opinion because of the evidence referred to therein and some of the additional evidence referred to in the dissenting opinion of Justice Johnson. I would also reprimand Judge Brown for the substantial time he devoted to compensated arbitration work which had no relation to the judicial duties for which he was being paid by the State of Texas. While I believe this Court has the power to reprimand or censure a judge for acts antedating his re-election, it seems to me that, undercertain circumstances, a different rule should apply as to removal from office. For instance, in the present case, I would not vote to remove Judge Brown for the acts referred to in either the majority opinion or Justice Johnson's dissent. They occurred prior to Judge Brown's re-election to office in 1972. The record indicates that most of such acts were either matters of public record or highly publicized. As long as judges are required to run the gauntlet of party primaries and general elections, I would be hesitant to set aside the decision of the electors because of acts which they presumably knew about before re-electing him to the office. See In re Laughlin, 153 Tex. 183, 265 S.W.2d 805 (1954).

REAVLEY, Justice (dissenting).

On March 6, 1971, the Judicial Qualifications Commission was informed by its Executive Director of the complaint against Judge David H. Brown. Notice was given to Judge Brown and he was requested to respond to the complaint. Two months later the Commission requested the Attorney General to investigate the items of complaint. An Assistant Attorney General was assigned to take the role of prosecutor, and he has actively pursued that assignment throughout the subsequent proceedings.

After the Supreme Court appointed the Master, he held preliminary hearings on January 3 and March 13 of 1972, and then the full hearing began in Dallas on May 22, 1972. One hundred witnesses were heard, and the floodgates were opened wide to allow expression of just about any dissatisfaction with Judge Brown's judicial behavior occurring from January 1, 1969 to June 8, 1972, when the testimony was concluded. The Master heard this testimony for thirteen days; the transcribed testimony consists of 2131 pages. The parties filed briefs by the end of October, 1972. The Master made his 37 page report and findings on November 20, 1972.

The Commission then set its own hearing for May 18, 1973, at which oral arguments were heard and briefs accepted, but no further evidence was taken.

The record that comes to us, with many exhibits, fills three packing boxes. Briefs filed in this Court total 363 pages. We have studied this record since oral submission on November 19, 1973.

After so much investigation and more than 39 months, it is time for a final decision upon the charges against Judge Brown. That decision must be based on the record before us. With the greatest respect for those who have decided otherwise, I have read this record and have been unable to see there any possible justification for finding Judge Brown to be unfit to hold his office. On the contrary, I regard most of the material of no consequence and not worthy of the time of the Master or the Commission—to say nothing of the imposition on Judge Brown. The unproved complaints hardly justify further attention at this juncture.

We are triers of fact here. The dominant finding I am required to make is that David Brown runs his courtroom and expects lawyers to attend to the business of trying their lawsuits. His punctuality and industry on the bench must be applauded. The plain fact is that few Texas judges can claim so productive a work record.

I find the testimony of Honorable Tom Ryan to be especially revealing. Judge Ryan was appointed to the bench when the 199th District Court was created by the Legislature in 1971. His judicial district includes only Collin County. Judge Brown's judicial district includes Grayson and Collin Counties. Prior to creation of the new court, the County Judge of Collin County had seldom held misdemeanor trials, and the docket was in deplorable shape. Misdemeanor jurisdiction was given to the new 199th District Court, and the cases were transferred to it. Since Judge Ryan had previously held office as County Attorney and Criminal District Attorney, he could not sit as judge to try the pending criminal cases. Judge Brown therefore sat in Collin County while Judge Ryan went to Grayson. Judge Brown promptly disposed of the misdemeanor docket. Judge Ryan encountered problems with some of the Grayson County lawyers. He testifies that lawyers due for nine o'clock settings would show up at eleven-thirty. Perhaps this may explain some of Judge Brown's difficulties.

Judge Ryan was able to get his settings honored in Grayson County, and he gives Judge Brown the credit for showing him how to do so. He told the Master that Judge Brown "is a very competent, impartial Judge, and I wish we had 212 in the State of Texas just like him . . . . He runs a very tight Courtroom, and one thing I have to thank him for. He has indoctrinated me to where I run the Court the same way."

I agree with these general findings of the Master:

> Judge Brown does preside over his court in a business-like manner. He opens his court promptly at the appointed time and insists that the attorneys, and others whose presence is required be present at the appointed hour: the evidence shows that he maintains excellent decorum. I find that Judge Brown does seem to become impatient with lawyers whom he believes are indulging in delaying tactics, or just stalling; he has also shown impatience toward attorneys in both civil and criminal cases, who come into court without preparation (in the Judge's opinion) to try the case in the trial of which they are engaged. It is shown that the Judge has been considerate with attorneys seeking a delay, or a continuance, due to a conflict of setting in other courts. It is shown that he does rule promptly on matters presented to him.

David Brown is not free of error and imperfection, and no canon or standard requires that of any of us. He should not have undertaken so heavy a load of compensable work while acting as arbitrator in 1969. I suppose that he agrees, for he terminated his arbitration work in 1970. Nevertheless, even in 1969 he did his judicial work with remarkable output and dispatch. All of the evidence establishes this fact beyond any question.

Judge Brown is censured by this Court because he assented to the Grayson County Sheriff's plan to record the conversation of a defendant while confined in jail. This was clearly a mistake; he was in the wrong. He says that his motivation was to obtain assurance that the defendant's counsel was not exercising improper influence and preventing a plea of guilty. Judge Brown does not explain why this assurance could not be obtained in open court. No justification appears for the invasion of the privacy of the lawyer-client relationship. It is fair to add, however, that this eavesdropping was unsuccessful and that it occurred in the summer of 1970 when the Judge and Sheriff were under great strain. A number of horrible crimes had been committed in Grayson County, and the jail was overcrowded with prisoners who included several dangerous men.

To my mind it is enough to write that Judge Brown should not have assented to the attempt at eavesdropping. Formal censure is directed at the man and his total

official performance. That is too much, too much for the one mistake by one who has so much to his credit.

I am unwilling to join in a censure of Judge David Brown. This Court should simply reject the recommendation of the Judicial Qualifications Commission.

WALKER, J., joins in this dissent.

SAM D. JOHNSON, Justice (dissenting).

This dissent is respectfully submitted. It is based upon the strongest possible disagreement with the rejection of the Judicial Qualifications Commission's recommendation that David H. Brown be removed from the office of district judge. The two incidents of willful conduct considered by the majority opinion alone are sufficiently inconsistent with the proper performance of judicial duties to warrant Judge Brown's removal. In addition, there were several other charges which through procedural error or inconclusive evidence were rejected by the majority. These other charges should not be terminated; instead they should be returned to the Commission for the curing of procedural defects and the taking of additional evidence.

At the time the matter of Judge Brown was considered, as now, the State Judicial Qualifications Commission consisted of nine members, each of whom resided in different Supreme Judicial Districts from the other. Pursuant to the Constitution,[1] two were justices of courts of civil appeals, two were district court judges, two were practicing attorneys, and three were public or nonlawyer members. The four members of the Commission who were judges or justices were chosen by the Supreme Court, the two attorney members were chosen by the Board of Directors of the Texas State Bar Association, and the three public or non-lawyer members were appointed by the Governor of the State of Texas. Each member of the Commission was chosen or appointed with the advice and consent of the Senate; each served without any form of compensation for his services.[2]

It was necessary that five of these Commissioners concur for a recommendation of removal to issue. The Commission devoted more than a year of careful deliberation to the charges, facts and evidence. At the conclusion, the Commission found Judge Brown guilty of misconduct on eight of the ten charges brought by the examiner, added a ninth charge to its finding, and by a *unanimous* vote of its members[3] recommended to this court that Judge Brown be removed from office.

The recommendation of removal was not the only alternative open to the Judicial Qualifications Commission. It could, of course, have completely rejected the charges against Judge Brown; or issued a private reprimand; or, more importantly, chosen the identical alternative taken by the majority of this court—public censure. Yet the Commission rejected these lesser measures, finding that the established behavior of Judge Brown was willful or persistent conduct clearly inconsistent with the proper performance of his judicial duties or casting public discredit upon the judiciary. This writer fully agrees that this court is not and should not be bound by the decisions or recommendations of the Commission and must make its own independent evaluation of the evidence adduced. The Commission's recommendation in this first and only such case in this state, however, is not merely supported by the required preponderance of the evidence; it is overwhelmingly supported by the evidence.

1. Tex.Const., Art. V, Sec. 1-a(2).

2. Art. 5669a. State Judicial Qualifications Commission, Sec. 3.

3. With the noted exception of Judge Vaughan who did not participate.

## CHARGES NOT CONSIDERED BY THE MAJORITY

The majority opinion declined to consider several charges brought by the Commission because of the procedural failure to properly notify Judge Brown of these charges at the Commission level. Also, there were other charges which were dismissed for lack of conclusive evidence. Proper consideration of the Commission's recommendation requires more than summary dismissal of these very serious charges.

The most serious of these charges involves the cancellation of a note owed by Judge Brown concurrently with the death of the holder. Judge Brown had borrowed $5,000 from Mrs. Minetta Kern and signed a note for that amount. Some time before or after her death the note was destroyed. Judge Brown, who was a beneficiary under Mrs. Kern's will, testified that Mrs. Kern had forgiven the debt and instructed him to destroy the note. The only witness corroborating this testimony was Judge

Brown's mother. As to the details of this matter—where the note was located, what was done with it—Judge Brown's testimony is contradictory.[4] These ambiguities in Judge Brown's testimony, combined with unusual circumstances, raise a significant doubt as to the veracity of this explanation. Our responsibility to the public for the quality of the judiciary demands that this court not terminate the investigation with doubts and questions of such magnitude remaining, but return this matter to the Commission for submission of further evidence.

Two other dismissed charges involve further conduct of Judge Brown during the Charles Easley prosecution. Charles Easley was an indigent criminal defendant who was charged with the murder of two young girls and held in jail for trial. On August 17, 1970 Judge Brown brought Easley before the bench in open court, without counsel, to inform him that his court-appointed attorneys, Mr. Davidchik and Mr. Jarvis, were being removed as Easley's counsel.[5]

4. Judge Brown had previously testified. that he obtained the note from Mrs. Kern's safety deposit box, but the bank records indicated otherwise. Before the master he admitted this story was not true and explained that he now remembered he had taken the note from a box in Mrs. Kern's home.
Also, Judge Brown could not remember whether it was he or Mrs. Kern who destroyed the note.

5. "August 17, 1970. The Court: Mr. Easley, I have asked the officers to bring you down because for some time I have been wanting to talk to you because of a number of matters. In the first place, I have had the reports from more than one source that it was your desire to enter a plea of guilty and that your lawyers wouldn't permit you to do so. As you know, the letter I wrote you on July 28th of 1970 I advised you that I was relieving Mr. Davidchik and Mr. Jarvis as your lawyers. I have Mr. Davidchik's letter of July 29th. Did you get a copy of that, sir?
"Mr. Easley: Yes, sir.
"The Court: I do want to say this. Mr. Davidchik and Mr. Jarvis are relieved as your court-appointed lawyers. Now if they want to represent you and you prefer them, it's

fine. It is not the intention of this court to refuse you permission to have any lawyer volunteer to help you. It is further not the intention of this court to insist on Mr. Walters. If you have an objection to him, I would consider other counsel. But Mr. Davidchik and Mr. Jarvis will not be your court-appointed lawyers. Again I want to emphasize, if you want them to serve for nothing, if you want them to be your lawyers, you have that right if they want to volunteer their services. Now I want to do everything that I can to help you insofar as provision of counsel is concerned and giving you a fair trial. Do you have anything to say to the Court?
"Mr. Easley: Mr. Davidchik said he wanted to take my case.
"The Court: Even if he didn't get paid?
"Mr. Easley: Yes. And I would rather have him.
"The Court: All right. All right. Is there anything else?
"Mr. Easley: That's all.
"The Court: You have nothing further to say to the Court?
"Mr. Easley: No, sir.
"The Court: All right. Thank you very much."

In their conversation Judge Brown mentioned rumors that the defendant's desire to plead guilty was being thwarted by his attorneys. When told that Judge Brown was removing his two attorneys, Easley remonstrated that he would prefer them to remain. Judge Brown replied noncommittally, and then asked if Easley had anything further to say, repeating the question after the first negative answer.

The second charge involved an alleged private conversation between Judge Brown and Easley in chambers at the Collin County Courthouse in December 1970. Easley testified that at this meeting Judge Brown attempted to convince him to plead guilty through threats and promises of leniency. All this conversation is said to have occurred outside the presence of Easley's attorneys. Before the master appointed by this court Judge Brown denied that such a meeting took place. However, in their briefs both parties mention an affidavit of Judge Brown's, not a part of the record, which allegedly expanded on the existing testimony and which would clarify the matter.

Two other incidents were brought forward by the Commission as further examples of Judge Brown's inclination to ignore his role of impartiality. First, he attempted to usurp the County Attorney's position as prosecutor by ordering him to prosecute all second offense D.W.I. cases as felonies or be held in contempt. In another incident, Judge Brown became outraged at the acquittal of a defendant because of the police failure to properly administer the *Miranda* warnings. Focusing his anger on the assistant county attorneys prosecuting the case, he again threatened use of the contempt power if another defendant was ever acquitted because of the failure to properly warn.

The majority opinion is to the effect that these charges were not properly before this court and consequently were not considered in reaching its judgment. It must be noted that such action by this court effectively terminates further consideration of these serious charges. The evidence before this court at the very least partially substantiates a showing of radical and undesirable departures from judicial impartiality. Additionally, there is a strong indication that evidence is available, though not before this court, which would prove or disprove the charges.

This dissent recommends the removal of Judge Brown on the basis of the charges considered by the majority alone. At the very least, this court should return the charges not considered by the majority to the Commission for the taking of additional evidence, thereby curing the existing procedural defects and assuring a complete examination of the charges. To allow a judge to possibly evade responsibility for serious wrongdoing because of procedural defects is to abrogate this court's responsibility to the judiciary. Charges as serious as these which are not properly before this court cannot be ignored. Consequently, the only judgment aside from removal in which this dissent could concur would be a remand to the Commission for the taking of further evidence.

ARBITRATION

The majority determined that the only two matters deserving of consideration were the matters of arbitration and electronic surveillance. These two charges alone are sufficient to uphold the Commission's recommendation of removal.

Focusing on the issue of arbitration, the majority opinion concludes:

"From a preponderance of the evidence and under all the circumstances in this record, however, the conduct of Judge Brown in acting as an arbiter or mediator was *not* such as to merit his removal *or* public censure; and he did *not* neglect the work of his court, in acting as arbiter, to such a degree as to require disciplinary action." [Emphasis supplied.]

The majority opinion therefore wholly exonerates Judge Brown on the issue of arbitration. Such activity is excluded from the majority's judgment of public censure and is held not to require *any* type of disciplinary action.

District (and appellate) judges in this state are among the highest paid civil servants. It must be assumed that the annual salary authorized by the Legislature [6] to be paid to a judge is for service in that capacity *alone* and that he is a full-time employee. It must also be assumed that a judge, upon obligating himself to the duties of that exalted position, undertakes it as his calling to the exclusion of all others; that he assumes the duties of that office as his paramount professional obligation; and that he looks upon his responsibility to that trust as his preeminent obligation and the one to which all other interests, particularly commercial, must defer.

Judge Brown stands condemned by his own testimony. He testified that in 1969, while he was serving as district judge, he received pay (at the rate of $100 per day) for his services as a *federal* arbitrator for 206 days.[7] Such federal work, which was performed during the ten-month period from February through November of that

year, actually paid Judge Brown *in excess* of his *yearly* state salary as district judge.[8] The record leaves no doubt that during such ten-month period alone Judge Brown received over $20,000 in salary for his work as a federal arbiter.[9]

Acting as an arbitrator was not at that time a violation of any canon of ethics. Since then the Code of Judicial Conduct of the American Bar Association [10] has been amended to provide that a judge should not act as an arbitrator or mediator. Judge Brown is not here criticized for the retroactive violation of a new canon. The *fact* of arbitration is not significant; what is significant is the amount of time Judge Brown spent away from his judicial post and the divided loyalty such work and income necessarily occasions.

The Commission found that Judge Brown was totally absent from his judicial post for at least 42 working days [11] and partially absent on 109 other working days during the ten-month period. A very substantial part of his working days during this period was spent out of his district and required substantial travel for extended distances from his judicial district.[12] Eligibility for over 206 days of full pay as a federal arbiter during ten consecutive

6. The budgeted state salary for Texas district judges for the fiscal year ending August 31, 1969 was $18,000, for the fiscal year beginning September 1, 1969, $20,000. This sum is increased by local supplementation in numerous Texas counties.

7. Judge Brown's exact testimony on this point is as follows:
"Q Have you by any chance added up the number of days that you drew compensation from either the National Mediation Board or the National Railway Adjustment Board for the year 1969?
"A Approximately two hundred and six, I believe.
" . . . .
"Q But during the year 1969 you did draw a full salary from either the National Mediation Board or from the National Railway Adjustment Board for two hundred and six days?
"A I drew pay for that many days as interpreted by the National Mediation Board and

the Arbitration Discipline, yes, sir." [Transcript of Proceedings, pp. 98, 99, 100.]

8. *See* note 6, *supra.*

9. Pay Vouchers, National Mediation Board and National Railway Adjustment Board, February through November 1969, gross salary, $20,650 plus per diem for same period paid to Judge Brown, $2,032.24.

10. Canon 5E, Code of Judicial Conduct, American Bar Association, 1972, "Arbitration. A judge should not act as an arbitrator or mediator." The American Bar's Code of Judicial Ethics has not been adopted in Texas.

11. The master found that Judge Brown was absent from his court for 47 days in 1969 and 1970.

12. Noted are trips to Topeka, Kansas, Oklahoma City, Oklahoma, three trips to Amarillo and five trips to Chicago, Illinois.

months, regardless of the time of day such work was performed, connotes an inevitable loss of both time and energy available for the performance of judicial duties. It is quite obvious that no private employer would countenance such divided interest and loyalty. So many hours and days spent away from his duties as a district judge of this state cannot but create a tendency to unduly accelerate the judicial process. Yet the serious matters of vital public interest in the work of a district judge deserve his undivided time and attention.

Judge Brown's work as a federal arbiter was not ancillary to his duties as a district judge of the State of Texas and in no way contributed to the fulfilling of this obligation. Federal work of this extent and magnitude can hardly be characterized as the industrious use of off-duty hours or vacation time; it cannot be classified as an occasional dereliction. Judge Brown's own testimony establishes that his work as a federal arbiter was willful, deliberate, repeated and extended, and solely for his own private interest and gain.

Judge Brown's disregard for his obligation to the public, to the judiciary, and to his fellow judges was both willful and persistent conduct inconsistent with the proper performance of his duties and as such fully justifies his removal from office.

## ELECTRONIC SURVEILLANCE

The second charge considered by the majority involves, if possible, an even more serious judicial offense; the willful violation of an attorney-client communication.

The facts surrounding the electronic surveillance are precisely outlined by Judge Brown's own testimony. Charles Easley, an indigent criminal defendant, was charged with the murder of two young girls and held in jail for trial. In April of 1970 Judge Brown appointed Mr. Davidchik and Mr. Jarvis as attorneys for Easley. As the spring progressed Judge Brown received several reports from the jailers that Easley desired to plead guilty but his attorneys refused to allow it. Consequently, in June or July of 1970, Judge Brown authorized the sheriff of Grayson County to secretly place an electronic recording device in the attorney-client conference room of the jail and record the conversation between the defendant and his court-appointed attorneys without their knowledge or consent. According to Judge Brown's own testimony, the purpose of the surveillance was to obtain a recording of the privileged communication between the attorneys and their client. Judge Brown stated, "I authorized them to use electronic means to monitor conversations which would have included the conversation between Easley and his Court appointed attorney. I did that, yes." [13] According to the sheriff of Grayson County, the person authorized by Judge Brown to conduct the secret recording, the first attempt to tape the conversation was unsuccessful. The authorization was unquestionably understood to be continuing, for it was then repeated a second time the following week. There is no indication that Judge Brown

---

13. Transcript of Proceedings, pp. 242–43:

"Q Judge, in your answer, as I recall, you admitted that in June of 1970 you authorized and instructed Mr. Blanton, the Sheriff of Grayson County, Texas to conduct electronic surveillance of a private conversation between Mr. Stephen Davidchik and Mr. Donald L. Jarvis with their client, Charles Dennis Easley while he was in the Grayson County Jail. Is that correct?

"A. That is not correct in that context, no, sir.

"Q Well, what context should we phrase it in then?
"A I authorized them, I didn't direct them to, at all, and this is in response to their request.
"Q Are you testifying that they initiated this move to conduct this electronic surveillance?
"A. No, I'm not testifying directly to that. It's a rather complicated affair. I authorized them to use electronic means to monitor conversations which would have included the conversation between Easley and his Court appointed attorney. I did that, yes."

withdrew or attempted to withdraw his authorization. Again, according to the sheriff, the person in whose custody the recordings would be, the attempt to tape the conversation was unsuccessful. The sheriff testified that he listened to the recordings and both were unintelligible. Subsequently, and without explanation, the tapes disappeared. Both Judge Brown and a deputy sheriff testified that they did not know what had happened to the tapes.

This was only the first in a series of alleged incidents in which Judge Brown abandoned the position of judicial impartiality during the Easley prosecution.[14] However, even when viewed alone the surreptitious surveillance of the conversations between Easley, an incarcerated criminal defendant, and his court-appointed attorneys constitutes conduct for which Judge Brown should be removed.

A person charged with a serious criminal offense, because of the circumstances created by his imprisonment, necessarily loses some of his constitutionally guaranteed rights. One right clearly preserved, however, is that of private communication with his attorney. Without the ability to discuss his case privately, free from any fear of disclosure, a defendant is effectively deprived of his right to counsel. To insure the security of this relationship and the resulting right to effective counsel, the law has gone so far as to prohibit the attorney from revealing these communications to anyone.

Because of the opportunities for violation of this relationship, the courts have been particularly protective of attorney-client conversations in jail. Eavesdropping by jail officials is firmly forbidden. Repeatedly the Texas Court of Criminal Appeals has criticized a jailer's refusal to permit a defendant any private communication with his attorney. Ellis v. State, 149 Tex.Cr. 583, 197 S.W.2d 351 (1946); McBride v. State, 121 Tex.Cr. 549, 51 S. W.2d 337 (1932); Sanderson v. State, 105 Tex.Cr. 198, 287 S.W. 251 (1926); Turner v. State, 91 Tex.Cr. 627, 241 S.W. 162 (1922). Such absolute protection exists not only in cases where a jailer refuses to permit conversation without his presence, but also when officials surreptitiously monitor the conversation through the use of electronic microphone. Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); State v. Cory, 62 Wash.2d 371, 382 P.2d 1019 (1963).

Justice Stewart of the United States Supreme Court in Lanza v. New York, 370 U.S. 139, 82 Sup.Ct. 1218, 8 L.Ed.2d 384 (1962), emphatically states the degree of protection to be accorded the attorney-client relationship in the context of a jail:

> "[I]t may be assumed that even in a jail, or perhaps especially there; the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection, . . . ." 370 U.S. 139 at 144, 82 S.Ct. at 1221.

The admitted purpose of the electronic eavesdropping authorized by petitioner was to learn the content of private conversation between Easley and his attorneys. Such action threatens the right of a defendant to effective assistance of counsel and contravenes all established legal tenets regarding the privacy of the attorney-client relationship. This is not a case of an incorrect decision on an uncertain point of law, but of the willful and deliberate disregard of an unquestioned legal principle. As such it is willful misconduct, inconsistent with the performance of judicial duties that casts public discredit upon the judiciary.

The majority recognizes the impropriety of Judge Brown's conduct in authorizing the secret electronic surveillance of attorney-client communications, but would seemingly offset this conduct with the favorable testimony of a larger number of attorneys. The record contains voluminous

---

14. *See* pp. 328 and 329 of this opinion.

testimonials of some 58 attorneys to the good characteristics and the good character of Judge Brown, but a reservation concerning all this testimony is in order. Without casting any aspersions on this testimony, any elected official should be able to garner a large number of supporters in court. A district judge, particularly, should be able to obtain attorneys favorable to him and more than willing to testify on his behalf.

This writer is in full accord with the majority opinion in stating that this is an instance where this court sits as the trier of facts. The function of this court is not to make this factual determination by weighing in the balance a judge's favorable and commendable conduct against the specific acts of judicial misconduct with which he is charged; it is not to weigh a judge's good and bad characteristics. It is submitted that balancing a judge's conduct is not the test of the Constitution.[15] The responsibility of this court, and only this court, is to remove a judge "for willful or persistent conduct, which is clearly inconsistent with the proper performance of his said duties or casts public discredit upon the judiciary or administration of justice." If the only issue were the proper punishment for Judge Brown, then consideration of his good acts or good character as a mitigating circumstance might well be appropriate. However, punishment is not the focus of a removal action; rather a removal action is instituted to protect the public from an overreaching or inadequate judge. If the act or acts at issue seriously violate the public interest in an unbiased and dedicated judiciary, then the judge must be removed regardless of the attributes of his other conduct. This court should not apply a test under which any misconduct, even that of a judge, may be justified.

Like most states, Texas has extended itself to make the judiciary the most independent of the three arms of government; it has sought to immunize the judiciary from legislative, executive, political or any other type of influence. The judges who make up the judiciary attain office through the democratic process, by election by the people they serve. Generally their terms of office are longer than those of other state officers. They are primarily responsible for the officers who serve in their courts, the attorneys who practice there and the citizen jurors who sacrificially participate in the administration of justice. Yet the judges themselves are rightfully considered to be above routine supervision or oversight.

When a judge is called to account for his stewardship, he is not to be weighed by the standards applicable to other citizens, to other court officers, or even by those demanding standards applicable to members of the legal profession.[16] A judge *exists* to promote justice and to serve the public interest; he must be measured by the most stringent and exacting criterion. Impropriety, or even the appearance of impropriety, on the part of a judge is demeaning, for it is destructive of public trust and confidence in the administration of justice.

The acts of Judge Brown here considered bear precisely upon his qualifications to hold public office, they are not ancillary or subsidiary. These acts have been clearly established by the overwhelming preponderance of the evidence. In the words of the Constitution,[17] Judge Brown should be removed from office for willful or persistent conduct which is clearly inconsistent with the proper performance of his said duties or casts public discredit upon the judiciary or administration of justice.

15. Tex.Const., Art. V, Sec. 1–a(6), par. A.

16. Canons of Ethics, State Bar of Texas.

17. Art. V, Sec. 1–a. Retirement, censure, removal and compensation of justices and judges; state judicial qualifications commission; procedure, (6), par. A.