

**NUMBER 13-10-00242-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**ROMEO LOMAS,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                     **Appellee.**

---

**On appeal from the 105th District Court
of Kleberg County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Chief Justice Valdez**

By four issues, appellant, Romeo Lomas, appeals his conviction for abuse of official capacity by misuse of government property, services, personnel, or any other thing of value belonging to the government, the use of which is valued at $20 or more but less than $500, a class B misdemeanor. *See* TEX. PENAL CODE ANN. § 39.02(a)(2),

(c)(2).[1]  In his first and second issues, appellant challenges the sufficiency of the evidence to support his conviction.  In his third issue, appellant contends that the trial court erred in permitting challenges to jurors on an improper basis.  In his fourth issue, appellant argues that the trial court erred in improperly admitting evidence of alleged prior bad acts.  As set forth below, we sustain appellant's fourth issue, reverse the judgment of the trial court, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Appellant has been the County Commissioner representing Precinct Four in Kleberg County for approximately 30 years.  On September 30, 2009, a Kleberg County grand jury indicted appellant for abuse of official capacity.  *See id.*  In relevant part, the indictment alleged as follows:

> [O]n or about March 2, 2009, in Kleberg County, Texas, [appellant] did then and there with intent to obtain a benefit, intentionally or knowingly misuse government property, services, or personnel, to wit: Kleberg County, Texas, vehicles and employees, which had come into defendant's custody or possession by virtue of the defendant's office as a public servant, namely, a County Commissioner of Kleberg County, Texas, by using Kleberg County, Texas, vehicles and employees to assist in hauling debris away from defendant's personal property and the value of said property, services, or personnel was $20.00 or more but less than $500.00; against the peace and dignity of the State.[2]

Appellant pleaded not guilty to the charged offense, and a jury trial commenced on April 9, 2010.

---

[1]  Section 39.02 was amended in 2009; however, the amendments became effective September 1, 2009, after the date the offense at issue in this case was allegedly committed.  *See* Act of May 2, 2009, 81st Leg., R.S., ch. 82, 2009 TEX. SESS. LAW SERV. 127 (West) (current version at TEX. PENAL CODE ANN. § 39.02 (West Supp. 2011)).  Thus, the prior version of the statute applies to this case.

[2]  Appellant was re-elected following his indictment.

In its case-in-chief, the State offered evidence to prove that on March 2, 2009, the date of the alleged offense, appellant was the elected County Commissioner for Precinct Four of Kleberg County, Texas. Appellant was also identified as the owner of certain real property located in Kleberg County, Texas. A number of witnesses testified that a barbershop had been located on the property. According to their testimony, the barbershop was demolished on March 2, 2009, the date of the alleged offense. The demolition work was performed by Eloy Saldana, who was not an employee of Kleberg County, Texas and who was not under the supervision of appellant in his capacity as the elected County Commissioner for Precinct Four of Kleberg County, Texas.

Subsequently, appellant directed two Kleberg County employees, Gus De Leon and Antonio Garcia, to take delivery of concrete "debris" from the premises and to deliver the concrete "debris" to the Precinct Four yard using trucks owned by Kleberg County.[3] The employees performed the work on county time. The State also introduced into evidence the county timesheets for De Leon and Garcia for the relevant two-week pay period from February 26, 2009 through March 6, 2009, which included March 2, 2009, the date of the alleged offense. The timesheets were signed by De Leon and Garcia, and they were also signed by appellant, as their supervisor. The timesheets included the following statement, which the State offered as evidence of appellant's guilt:

> UNDER PENALTY OF PERJURY, I CERTIFY THAT THE ACTUAL
> PHYSICAL HOURS WORKED (APHW), AS REPORTED ABOVE WERE

---

[3] "'Debris' is defined as 'an accumulation of loose detached fragments of rock' and 'the remains of something broken down or destroyed.'" *Gutierrez v. Trevino*, No. 04-99-00274-CV, 2001 Tex. App. LEXIS 1844, at *31 (Tex. App.—San Antonio Mar. 21, 2001, pet. denied) (mem. op.) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 582). "The word, as defined, does not necessarily mean something damaging." *Id*. It is a broad term. *See id*. We conclude that everything at issue in this case is "debris."

3

PERFORMED BY ME FOR THE SOLE BENEFIT OF KLEBERG COUNTY AND NOT FOR THE BENEFIT OF ANY PERSON, PRIVATE BUSINESS, CORPORATION, OR OTHER.

Other evidence offered by the State included the testimony of Sam Fugate, the Mayor of Kingsville. According to Fugate, on the morning of March 2, 2009, he drove by appellant's property and observed the following:

Well, they had demolished or demoed his barbershop which sits on the front of the lot, and there was a Precinct 4 truck that had backed in and they were loading it.

. . .

Well, it really surprised me to see that truck there so I stopped and watched, and they were - - there was a guy there with a backhoe and a front end loader. They had already mashed the house - - if you've ever seen one of these old houses or old buildings demoed what they do is they just tear them apart and then they scoop up the debris, and they were in the process of scooping up debris.

. . .

From what I saw they had already mashed the building and they were picking up the building and putting it in the truck.

Subsequently, the State elicited the following testimony from Fugate:

[Q.]: And why did you think it was significant that there was this Precinct 4 county truck parked on the private residence of the defendant's?

[A.]: Well, I know [appellant] is a county commissioner and I know he's in charge of that equipment, and it just surprised me that he had it in his front yard and he was loading that barbershop, using it for personal purpose.

On cross-examination, Fugate testified as follows:

[Q.]: All right. So all there was - - all you could see was a truck, the bulldozer, and I guess [appellant's] house in the back?

[A.]: You could see the demoed house or the house that had been mashed, the truck in the front, and the backhoe in the back in front of his house.

4

[Q.]: And, so, all that was left to do is to pick up the debris and put it in trucks and haul it off; is that correct?

[A.]: That's correct.

The State also called Kleberg County Judge Pete de la Garza as a witness. He testified that he passed by appellant's house on the day in question and described what he saw as follows:

[Q.]: Okay. And did you notice if anything was going on at that time?

[A.]: Well, I saw that he was demolishing a building and I saw a backhoe that was there. And I recognized the backhoe because I know who it belongs to, it belongs to Mr. Eloy Saldana, and Mr. Saldana has done work for me before so I paid no reasonable attention to it, I just went on and went to work.

[Q.]: And, so when you - - was Mr. Saldana working when you passed by?

[A.]: No. There was nobody there that I saw.

[Q.]: Just a backhoe? Just the backhoe was sitting on the - -

[A.]: Yes, just a backhoe.

[Q.]: And that backhoe was sitting on the private residence of the defendant?

[A.]: It was, yes, very close to the sidewalk, yes.

On cross-examination, the following exchange took place:

[Q.]: And what did you witness? What crime did you witness?

[A.]: The only thing I witnessed . . . was the backhoe there that belonged to Mr. Saldana and I took pictures of that backhoe and of that debris.

[Q.]: And that - -

[A.]: That is what I witnessed.

5

[Q.]:   And that in and of itself is not a crime.

[A.]:   No.

Another witness called by the State was Nelda Alvarez, County Commissioner

for Precinct Two of Kleberg County, Texas, who gave the following testimony:

[Q.]:   Now, you're aware that we're here on the allegation of county property being used, concrete being dumped, and I want to take you back to around March 2, 2009, probably after that date. Did you have a conversation with [appellant] concerning that ditch?

[A.]:   Yes. We've always - - we had conversations several times on the ditch.

[Q.]:   And what did that conversation consist of when you talked about that ditch?

[A.]:   Okay. For me to remember exactly what the conversation, we had several conversations because we have erosion problems out there and he's had - - in the past had to take dirt out there all the time and he would tell me, "I went over there and I took care of it," you know, and "the guys went out there." And usually when I call him on erosion problems, because we had another one past the bridge, there was another one where they had to replace the culvert and all that, and I remember that one very well because it was in the summer and I had to go and tell the people that they had to leave their homes because they would - - the men were going to be working at 8:00 o'clock and they would not be able to get in or out of their homes. So we've had several conversations on the ditch.

. . .

[Q.]:   And all of those conversations were prior to March 2, 2009, or after?

[A.]:   Sir, I've had conversations all the time. I didn't - - I didn't document the dates.

On cross-examination, Alvarez testified as follows:

[Q.]:   And, Ms. Alvarez, it's not your testimony that [appellant] did not talk to you about concrete before March 2, 2009, it's just that you don't remember.

6

[A.]:   Right.

The next witness called by the State was Eloy Saldana, who testified in relevant part as follows:

[Q.]:   There's two different trucks, correct?

[A.]:   Right.

[Q.]:   Did you load both trucks?

[A.]:   I remember I loaded the first truck.  I don't know about the second one.  The first one I put about three or four pieces of concrete that's on - -

[Q.]:   And we'll get there, hold on.  Now, you loaded two different trucks, is that correct, two different Precinct 4 trucks?

[A.]:   Well, I don't remember the second truck.  I remember the first one. I don't know if I loaded that second truck.

[Q.]:   Okay.  So which one of these do you remember loading?

[A.]:   The small dump.

[Q.]:   This one right here?

[A.]:   Yeah, this one.

[Q.]:   And what does that say on the cab there, State's exhibit 5?

[A.]:   Kleberg County Precinct 4.

. . .

[Q.]:   Okay.  Are . . . [Gus De Leon and Antonio Garcia] both Precinct 4 employees?

[A.]:   Yes.

[Q.]:   And you know - - so you don't know if they switched out one dump truck or drove different trucks, is that what you're saying, or do you know?

7

[A.]: I just remember [Garcia's] truck. I don't remember that other one, that flat bed, that other one [De Leon].

[Q.]: Okay. But you also loaded a truck that [De Leon] was driving?

[A.]: I don't remember. I know I loaded [Garcia's].

[Q.]: Okay. Are you sure about that? Do you need a chance to refresh your memory?

[A.]: I don't remember loading [De Leon's] truck, you know.

[Q.]: You don't remember loading [De Leon]?

[A.]: No.

. . .

[Q.]: Did - - was there a - - you said just three pieces of concrete?

[A.]: No. There was about three pieces of sidewalk.

[Q.]: Of sidewalk concrete, okay. Anything else? Did you load anything else into [Garcia's] truck?

[A.]: Just maybe a piece of lumber or I don't know.

[Q.]: Just like one piece, just a little bit?

[A.]: Not much.

The next witness called by the State was De Leon, a Kleberg County employee working under appellant's supervision in Precinct Four, who testified in relevant part as follows:

[Q.]: And what were the instructions [appellant gave you] at that time [March 2, 2009]?

[A.]: To pick up a dump truck and pick up some cement and haul it back to the yard.

[Q.]: And when you say dump truck you're talking about the county dump truck?

8

[A.]: Yes.

[Q.]: And so did you in fact follow . . . [appellant's] instructions?

[A.]: Yes.

. . .

[Q.]: Okay. And what did you do at that point?

[A.]: I parked in the street and Mr. Saldana loaded up the concrete.

[Q.]: And how much concrete was loaded up?

[A.]: I hauled two loads that were about half a truck.

[Q.]: And when you say two loads, are you talking about two trips?

[A.]: Yeah, two trips.

. . .

[Q.]: Okay. So where do you take that one load of concrete?

[A.]: To our yard.

[Q.]: And when you say the yard, is that the Precinct 4 yard?

[A.]: The Precinct 4 yard.

. . .

[Q.]: And then what did you do after that, after the first load?

[A.]: Went back for the second load.

[Q.]: And what was loaded up in the second load?

[A.]: The rest of the concrete.

. . .

[Q.]: Was there any debris, any wooden debris in with that concrete?

[A.]: No.

9

[Q.]: Were you - - where were you when it was being loaded?

[A.]: The concrete?

[Q.]: Yes.

[A.]: Sitting in the truck.

[Q.]: So how would you know if there was wooden debris or not back there?

[A.]: Because I checked the load before I left.

[Q.]: And then when you dumped it in the yard was there any - - is there any wooden debris in the yard where you dumped it?

[A.]: No.

. . .

[Q.]: And it was your understanding you were the only one that was picking up anything from the barber shop that day; is that correct?

[A.]: Yeah.

. . .

[Q.]: Did you perform any work out at Sage Road as to the putting the concrete out there?

[A.]: It's - - yeah, Sage.

. . .

[Q.]: And when was that?

[A.]: We've been doing it on and off.

[Q.]: The - -

[A.]: I don't remember exact dates.

. . .

[Q.]: Okay. So after the second week of May 2009 can you remember going forward when you did any work out there?

10

[A.]: We've gone twice I think after I got back.

[Q.]: Okay. And do you know when that was?

[A.]: I don't have exact dates.

[Q.]: Okay. Do you know what you put out there?

[A.]: The concrete.

The next witness called by the State was Garcia, an employee of Kleberg County, Texas working under the supervision of appellant in Precinct Four. On direct examination, Garcia testified as follows:

[Q.]: Do you recall hauling anything from . . . [appellant's] barbershop?

[A.]: Yes, I remember doing that.

[Q.]: And what exactly - - what did you haul from his barbershop?

[A.]: Well, he told me to take the truck and go to his residence over there because there was, Mr. Saldana was going to be there and there was going to be concrete and to dump the load at the yard.

[Q.]: And go back. When you said he told you to go over there who are you referring to as he?

[A.]: [Appellant].

. . .

[Q.]: [So] after lunch you went over there and what was loaded into the Precinct 4 truck?

[A.]: Debris.

[Q.]: Debris? And when you say debris what do you mean by debris?

[A.]: From the barbershop, debris and lumber and a bunch of the wood that was going to the truck.

[Q.]: So wooden debris?

11

[A.]:   Yeah, something like that.

[Q.]:   How much debris was loaded?

. . .

[A.]:   Exactly how much, I don't know - - they just he told me to load up the truck with debris.

. . .

[Q.]:   And, so, were you sitting in the truck or out of the truck?

[A.]:   I was sitting briefly inside the truck and then I got out.  I walked to the back of the truck and I waited until he finished loading the truck.

[Q.]:   And did you see what was being loaded at that time?

[A.]:   I saw him grab a bunch of debris and put it in the truck.

[Q.]:   Wooden debris?

[A.]:   Yeah.

. . .

[Q.]:   Okay.  And did you see any concrete being loaded?

[A.]:   I didn't see, it might be.  I didn't see any concrete.

[Q.]:   You didn't see any concrete?

[A.]:   I wasn't sure if there was any or not, I don't know, sir.

. . .

[Q.]:   So after it's loaded . . . where did you take it after that?

. . .

[A.]:   I took it to the yard.

[Q.]:   And what's the yard?

[A.]:   Precinct 4.  I dumped it where we have a pile, caliche pile and dirt pile and concrete pile.  I just dumped it there.

12

[Q.]: So you dumped the debris right there, the wooden debris out in the yard. Is that outside the fence part?

[A.]: Outside the fence yes, sir, on the south side.

[Q.]: Okay. And was there already wooden debris out there?

[A.]: No, sir.

. . .

[Q.]: Was [appellant] . . . outside at all when you were out there?

[A.]: I never saw him there, sir, I don't remember.

[Q.]: And who told you to go and take the Precinct 4 trash truck over to his house to be loaded up?

[A.]: [Appellant].

. . .

[Q.]: Now, you had said earlier - - what did he tell you exactly?

[A.]: He told me to take the truck, the trash truck to his residence, there was going to be some - - Saldana was going to be there to load me up and there was going to be concrete and to dump the load at the yard.

[Q.]: Okay. And so - - but you're saying, you're telling the jury that you didn't even see any concrete?

[A.]: I'm not sure there was any no, sir.

[Q.]: So did you stop Saldana and say no, no. I'm only supposed to have concrete loaded up?

[A.]: No, sir.

On cross-examination, Garcia testified as follows:

[Q.]: Mr. Garcia, you were called by . . . [appellant] and told to bring a trash truck to pick up concrete and only concrete; is that correct?

[A.]: He said it was going to be concrete, yes, sir.

13

[Q.]:   Now, when you got there . . . [appellant] wasn't on the property?

[A.]:   No, he was not.  I didn't see him there.

[Q.]:   And whatever they put in the back of your truck you didn't see any concrete, you saw debris but you don't know whether there was concrete or not mixed?

[A.]:   I don't know if it was there or not.  I don't know, sir.

The next witness called by the State was Robyn Wilson, an investigator for the Office of the Texas Attorney General.  On direct examination, Wilson testified in relevant part as follows:

[Q.]:   Now, Sergeant Wilson, when you talked to [appellant] about this situation, what did he tell you concerning the alleged incident?

[A.]:   I told him that I was there investigating some allegations that had been made about the barbershop and he said that he did not use any county equipment or county personnel.

. . .

[Q.]:   Now, at any time during that interview did [appellant] ever bring up the subject of concrete?

[A.]:   No.

[Q.]:   And at any time during that interview did [appellant] ever indicate that county trucks were used to take debris from his residence?

[A.]:   No.

On cross-examination, Wilson testified that appellant was initially suspected of "using county trucks and labor to remove and demolish a building."  Wilson conceded that there was no evidence that appellant used county vehicles or employees to demolish a building.  On the contrary, the evidence established that a private contractor had demolished the barbershop.  Wilson also testified that appellant was later suspected of

14

using county vehicles and employees to transport debris from the former barbershop to a landfill. Again, Wilson conceded that there was no evidence that appellant used county vehicles or employees to transport debris from the barbershop to a landfill. On the contrary, the evidence established that the debris was transported to the Precinct Four yard. The following exchange occurred on cross-examination by defense counsel:

[Q.]   So are we here just because of the concrete and it's developed from demolishing a building with county funds, transporting debris to the landfill with county equipment, and now we're at—are we basically now accusing him of transporting concrete?

[A.]   No, sir. We're accusing him of using his position as a County Commissioner to gain personal benefit.

[Q.]   Okay. And what is the personal benefit? Can you tell me that?

[A.]   You're asking for my opinion?

[Q.]   I want your opinion.

[A.]   You want my opinion. My opinion is that during this process he got caught and was unable to use the county equipment and the county, the city landfill to dispose of the barber shop and so what actually happened was he was unable to use the county labor and the county trucks for a limited period of time.

In addition to the foregoing, the State also offered evidence of what it alleged to be two prior instances of criminal conduct involving certain employees of Kleberg County working under appellant's supervision in Precinct Four. This evidence was offered through the testimony of Alex Soliz, a former employee of Kleberg County - Precinct Four.[4]

---

[4] Prior to the witness taking the stand, the trial court held a hearing outside the presence of the jury and ruled that the testimony would be allowed under Rule 404(b). *See* TEX. R. EVID. 404(b).

15

The first incident, which took place sometime in 2003,[5] involved the use of county vehicles and employees to transport caliche and dirt from the Precinct Four yard to a location on County Road 1118, on or near the private property of Sergio Bustamante, who was also an employee of Precinct Four. Soliz testified that, at the time of the incident, the employees were working on a county culvert and that "[t]he only thing that wasn't county work [was] . . . all that dirt." According to Soliz, a roping arena was located on Bustamante's property, and Bustamante told him to deposit the dirt in that location: "I was told by Mr. Bustamante to knock down some dirt inside the arena. He was told - - he told me that [appellant] told me that I could do that. So in obedience to my supervisor I dumped what I was told."

Soliz also testified about a second incident, which took place sometime between 2004 and 2005 and also involved the use of county vehicles and employees. Soliz testified that, while he was employed by Kleberg County, on county time, and under the supervision of appellant, the County Commissioner for Precinct Four, he was ordered by appellant to use a county vehicle to travel to Loves Truck Stop. At Loves Truck Stop, Soliz followed instructions from appellant to load the truck with dirt. Then, still following orders, Soliz drove the truck to De Leon's private property, where the dirt was unloaded and spread around the property using a backhoe owned by Kleberg County and operated by De Leon. Soliz testified that he did not know whether appellant knew the county backhoe was being used for this purpose.

Finally, appellant took the stand and testified on his own behalf. According to appellant, on March 2, 2009, he instructed De Leon and Garcia to move concrete debris

---

[5] There was some confusion about when the first incident occurred. Soliz testified to two different approximate dates. The first was sometime in 2003, and the second was a date between 2004 and 2005.

16

from a demolished barbershop on appellant's private property to the Precinct Four yard. Appellant stated that he donated the concrete debris to the county and later used it to reinforce the bulkhead of a Precinct Two drainage ditch that is prone to erosion. Appellant stated that, on the afternoon of March 2, he inspected the concrete debris that was dumped at the Precinct Four yard. Appellant noticed that some wooden "debris" was mixed in with the concrete debris. Appellant testified that he borrowed his secretary's personal pickup truck and hauled the wooden debris back to his property. It was taken to a landfill the next day. According to appellant, when Judge De La Garza questioned him about the reported use of county equipment on his private property, he told him that he used the county trucks because he was donating the concrete debris to be used in repairing a bulkhead in Precinct Two. When asked on cross-examination why he told Sergeant Wilson that he did not use county equipment or personnel in hauling concrete debris from his property, appellant said he did not tell Sergeant Wilson about donating the concrete debris for county use because she did not ask him about it.

In his closing argument, the prosecutor repeated and emphasized his allegations regarding other instances of conduct involving county vehicles and employees under appellant's supervision:

> Al Soliz told you about two more instances of while he was a county employee that he used county equipment on county time and for the personal benefit of Gus De Leon, one of the same witnesses that's trying to help the defendant there, and for Sergio Bustamante, that he took dirt, county dirt and used county equipment to go out there, your taxpayers for their benefit, which benefits [appellant] because he keeps, takes care of his boys then they'll be loyal to him when he wants it done himself. They'll come and try to cover up everything for him so he's lying times two . . . .

> So what we have here is that the only person that's telling the truth according to [appellant], is [appellant] that's charged with a crime, Gus De

17

Leon, and Garcia who are also his employees, who are also a party to the crime, so consider that. But everyone else, they're liars.

In his final remarks, the prosecutor told the jury about the message a guilty verdict in this case would send to Kleberg County:

It tells future elected officials, hey, Kleberg County, I better do this legally. I've got to do this legally because are you really buying this donated concrete story? Even if you bought that story, he still got a benefit. He got the concrete taken away from his property. What if your concrete was in your front yard and someone just came and got it for free[?] [T]hat's a benefit, but he used taxpayer money, equipment, employees.

The jury found appellant guilty. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

In his first and second issues, appellant challenges the sufficiency of the evidence to support his conviction. In his first issue, appellant argues that the evidence is insufficient because there is no evidence that he misused government property, services, or personnel in violation of section 39.02(a)(2) of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 39.02(a)(2). In his second issue, appellant argues that the evidence is insufficient because there is no evidence that he intended to obtain a benefit. *See id.* The State maintains that the evidence is sufficient to prove both elements.

### A. Standard of Review

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact finder could have found guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) ("[T]he *Jackson* legal-sufficiency standard is the only standard that a reviewing court should apply in

determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."). This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony . . . ."). Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the fact finder reached a rational decision. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *Malik*, 953 S.W.2d at 240.

## B. Applicable Law

In relevant part, the penal code provides as follows:

(a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly:

. . .

(2) misuses government property, services, personnel, or any other thing of value belonging to the government that has come into

19

the public servant's custody or possession by virtue of the public servant's office or employment.

TEX. PENAL CODE ANN. § 39.02(a)(2).

The Texas Penal Code defines "misuse" as follows:

to deal with property contrary to: (A) an agreement under which the public servant holds the property; (B) a contract of employment or oath of office of a public servant; (C) a law, including provisions of the General Appropriations Act specifically relating to government property, that prescribes the manner of custody or disposition of the property; or (D) a limited purpose for which the property is delivered or received.

*Id.* § 39.01(2).

## C. Discussion: Misuse

In his first issue, appellant contends that the evidence is insufficient to establish that he misused county vehicles and employees.

To prove the "misuse" element of the offense, the conduct at issue must meet the statutory definition of "misuse," which includes four different categories of "misuse." *See id.* § 39.01(2). The State maintains that appellant's conduct fits within the first category of "misuse," which prohibits dealing with property contrary to an agreement under which the property is held. *See id.* § 39.01(2)(A). The statute does not define "agreement." However, in the context of the misapplication-of-fiduciary-property statute, *see id.* § 32.45 (West Supp. 2011), the Fourteenth Court of Appeals has construed the term "agreement" to mean "a harmonious understanding as to a course of action." *Anderson v. State*, 322 S.W.3d 401, 406 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). According to the State, the employee timesheets signed by appellant constitute evidence of an agreement that appellant would use county vehicles and employees "for the sole benefit of Kleberg County and not for the benefit of any person, private

20

business, corporation, or other." We agree. Therefore, to prove the element of "misuse," the State had the burden to produce evidence that appellant breached this agreement.

The indictment alleged that appellant committed "misuse" by using county vehicles and employees to assist in hauling debris from appellant's personal property. At trial, the uncontroverted evidence established that appellant instructed two county employees, De Leon and Garcia, to use two county vehicles to haul debris from his personal property. The employees performed this work on county time.

Appellant argues that the evidence is insufficient to prove "misuse" because the State failed to prove that appellant received a personal benefit from his use of county vehicles and employees. Although there was evidence that appellant donated two of the three truckloads of debris to the county for use in a county project in Precinct Two and therefore did not receive a benefit with respect to those two truckloads, the jury was not obligated to accept that evidence. *See Wise v. State*, 364 S.W.3d 900, 906 (Tex. Crim. App. 2012) (holding that jury did not have to believe defendant's brother's uncontroverted testimony that defendant purchased a computer at a flea market in 2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (stating that the finder of fact "may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted"); *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. [Panel Op.] 1978) ("The jury, or trial judge in a trial before the court, is the sole judge of the credibility of the witnesses and may accept or reject any part or all of the testimony given by State or defense witnesses."); *see also Winfrey v. State*, No. PD-0943-11, 2013 Tex. Crim. App. LEXIS 431, at *37 (Tex. Crim. App. Feb. 27, 2013) ("The jury did

not have to believe appellant's self-serving statement that she always shaves her pubic hair, especially in light of Jason's testimony indicating that the shaving occurred in response to the warrant.").

"We [must] resolve inconsistencies in the testimony in favor of the verdict." *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination." *Temple v. State*, No. PD-0888-11, 2013 Tex. Crim. App. LEXIS 161, at *51–52 (Tex. Crim. App. Jan. 16, 2013). Furthermore, we "may not re-weigh the evidence and substitute our judgment for that of the jury." *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

Accordingly, we must defer to the jury's resolution of the conflicting evidence with regard to whether appellant received a personal benefit. When viewed in the light most favorable to the verdict, the combined and cumulative force of all the evidence supports a reasonable inference that appellant realized a personal benefit. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012).

Accordingly, appellant's first issue is overruled.

**D. Discussion: Intent to Obtain a Benefit**

In his second issue, appellant argues that the evidence is insufficient because there is no evidence that he intended to obtain a benefit. Specifically, appellant argues that there is no evidence that the value of the debris he donated to Kleberg County was less than $52.52, the value of the use of county vehicles and employees to transport the debris. However, under the case law interpreting this section of the penal code,

22

evidence that the county received a benefit is not controlling with regard to the sufficiency of the evidence to prove appellant's intent to obtain a benefit. *See Campbell v. State*, 139 S.W.3d 676, 684 (Tex. App.—Amarillo 2003, pet. ref'd) ("[U]nder the case law, evidence of a benefit to the Department is not controlling in a legal sufficiency analysis of the evidence supporting a finding of appellant's intent to obtain a benefit.").

We note that the evidence of appellant's intent to obtain a benefit is circumstantial in nature; however, that does not render it insufficient. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."). We conclude that the jury could have reasonably inferred that appellant intended to obtain a benefit based on his conduct in using county vehicles and employees to haul debris from his personal property. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."). The jury was not obligated to accept appellant's testimony to the contrary. *See Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) ("[T]he jury, as the sole judge of the weight and credibility of the evidence, was free to accept or reject any or all of the evidence of either the State or the defense, even if that evidence was uncontradicted."). Accordingly, we conclude that the evidence is sufficient to support the jury's verdict. *See Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993) (explaining that "the evidence is not rendered insufficient simply because appellant presented a different version of the events").

Appellant's second issue is overruled.

23

### III. CHALLENGES FOR CAUSE

In his third issue, appellant contends that because the State was permitted to successfully challenge numerous jurors for cause, he "was tried by a jury that excluded his supporters and included his detractors." We first note that appellant provides no citations to the record in support of this issue. *See* TEX. R. APP. P. 38.1(i). Moreover, the record reflects that after voir dire, counsel for appellant and the State each submitted strikes and each counsel was given a list of jurors selected. Defense counsel confirmed on the record the agreed strikes for cause. Thereafter, the trial court asked specifically, "Any objections to the listing of the jurors?" Defense counsel responded, "[t]he defense has no objection." Thus, no issue is preserved for our review. *See* TEX. R. APP. P. 33.1; *Butler v. State*, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994) ("A timely and reasonably specific objection is required to preserve error for appellate review."). We overrule appellant's third issue.

### IV. EVIDENCE OF EXTRANEOUS OFFENSES

In his fourth issue, appellant contends that the trial court improperly admitted evidence of alleged extraneous offenses. Appellant argues that the evidence should not have been admitted for any purpose and was unfairly prejudicial.

#### A. Standard of Review

We review a trial court's decision to admit evidence for an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's decision is correct on any theory of law applicable to the

24

case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B. Applicable Law

Evidence of an extraneous offense is admissible if it has relevance apart from its tendency to prove the character of a person in order to show that he acted in conformity therewith. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). Rule 404(b) provides as follows:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(b); *Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996); *see also Garcia v. State*, 893 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1994, pet. ref'd) ("Evidence of other crimes may be admitted to show intent and identity unless the prejudicial effect substantially outweighs its probative value."). Additionally, extraneous evidence may be relevant and admissible to rebut a defensive theory. *Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

Before evidence of an extraneous offense is admissible, the trial court, in determining relevance, must make a determination that the jury could find beyond a reasonable doubt that the defendant committed the extraneous offense. *See Garcia v. State*, 893 S.W.2d 17, 19 n.1 (Tex. App.—Corpus Christi 1994, pet. ref'd) (citing *Harrell v. State*, 884 S.W.2d 154 (Tex. Crim. App. 1994)); *see also Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) ("When evidence of extraneous offenses has

been offered, regardless of the respective phase of a trial, the law requires that it be proved beyond a reasonable doubt that the defendant committed the said extraneous offenses, or is at least criminally responsible for its commission.").

## C. Discussion

In a hearing held out of the presence of the jury, appellant argued that evidence of prior bad acts was not admissible during the State's case-in-chief. *See Daggett v. State*, 187 S.W.3d 444, 454 (Tex. Crim. App. 2005) ("While generally such evidence is admissible only during the State's rebuttal, we have previously found that, if extraneous offense evidence is improperly introduced during the State's case-in-chief, any error may be cured by the defendant's subsequent testimony which 'opens the door' to rebuttal."). Appellant also argued that the evidence was not admissible under Rule 404(b). *See* TEX. R. EVID. 404(b).

The trial court ruled that the evidence would be admitted. *See* TEX. R. EVID. 103(a)(1) ("When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections.").

On appeal, appellant argues, *inter alia*, that pursuant to *Reeves v. State ex rel. Mason*, 267 S.W.2d 666, 669 (Tex. 1924), the "forgiveness doctrine" bars the admission of evidence of illegal acts committed during a prior term of office.[6] *Reeves* was a quo warranto proceeding to remove a county sheriff and stands for the proposition that an

---

[6] The "forgiveness doctrine" refers to the idea "that pre-election conduct does not disqualify one from holding office the same way post-election conduct does." *In re Bazan*, 251 S.W.3d 39, 42 (Tex. 2008) (orig. proceeding). "The doctrine's rationale is that the public has the authority 'to forgive the misconduct of an elected official' following a campaign in which all the facts would presumably become known." *Id.* (quoting *In re Brown*, 512 S.W.2d 317, 321 (Tex. 1974)).

26

elected official "cannot be removed for acts committed prior to his election to the term of office he is holding." *Id.* In its appellate brief, the State argues that the forgiveness doctrine is inapplicable to the instant case. We agree with the State. The forgiveness doctrine is not a rule of evidence. Accordingly, the trial court's ruling was not erroneous with respect to the forgiveness doctrine.

This leaves the question of whether the trial court properly admitted the evidence under Rule 404(b). *See* TEX. R. EVID. 404(b). The State offers three arguments for why the evidence was properly admitted under Rule 404(b). *See Santellan v. State*, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997) ("If the opponent of extraneous offense evidence objects on the grounds that the evidence is not relevant, violates Rule 404(b), or constitutes an extraneous offense, the proponent must satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value."). Each will be addressed in turn.

First, according to the State, the evidence was admissible to rebut appellant's suggestion during his opening statement and cross-examination of Sergeant Wilson that the State went back ten years and could not find any evidence against him. *See Hernandez v. State*, 897 S.W.2d 488, 494 (Tex. App.—Tyler 1995, no pet.) (holding that defense counsel's question, "Have you ever had any other type of problems with the law?" and defendant's answer of "No," opened the door to fact that defendant was wanted for murder in Mexico). In relevant part, counsel for appellant's said the following in his opening statement:

> What you will see is that after this high dollar investigator kept hitting a brick wall because everything they were alleging that [appellant] did was not true, and instead of saying, Yah, it's enough and walking away, they tried to save face. And you will hear the hours and hours and hours and

27

the thousands of dollars that they spent, the State of Texas, investigating [appellant] not only from the March 2, 2009 incident, but they went back seven, eight, nine years and they dug and they dug and they spent more.

. . .

But do they stop there? No. No, because they have to destroy this guy.

The State argues that the foregoing raised a defensive theory to the effect that "the State went back ten years and could not find any evidence against [appellant]." *See Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988) ("[P]robably the most common situation which gives rise to the admission of extraneous offenses is in rebuttal of a defensive theory."). Therefore, according to the State, appellant opened the door to evidence of any wrongdoing he committed in the prior ten years. *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("A party opens the door by leaving a false impression with the jury that invites the other side to respond."). We disagree.

In his opening statement, counsel for appellant told the jury that the investigation "went back" almost ten years. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (holding that a defense opening statement may open the door to the admission of extraneous-offense evidence to rebut defensive theories presented in that opening statement). Counsel gave the jury two reasons why the investigation went back almost ten years. First, according to counsel, the State was unable to find any evidence to prove the charged offense that allegedly took place on March 2, 2009. Counsel told the jury that the State's "high dollar investigator kept hitting a brick wall because everything they were alleging that [appellant] did was not true." Second, in counsel's opinion, the real agenda behind the investigation was political. Thus, instead of terminating the investigation when no evidence was uncovered, the State continued

28

to pour money and resources into an ever-widening investigation into appellant's past. According to counsel, the actual reason for the investigation going back so far was to advance a political agenda. As counsel told the jury:

> [Appellant has] been a county commissioner for over 30 years and has always won, always had an opponent and always won by 70 percent. But they wanted to destroy him to make sure that it didn't happen again because the elections were coming up.

Counsel did not hold his client out as being a perfect law-abiding citizen who would never commit any criminal offense or who had not committed any criminal offense in the prior ten years. *See Roberts*, 29 S.W.3d at 601 ("When a defense witness presents a picture that the defendant is not the type of person to commit the charged offense, the prosecution may impeach the defense witnesses' testimony by introduction of similar extraneous offenses."). Rather, counsel vigorously opposed the State's case, maintaining that the evidence was insufficient to prove the charged offense. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) ("But a mere denial of commission of an offense generally does not open the door to extraneous offenses because, as appellant properly points out, a defendant generally denies commission of the offense at trial—that is the reason for having a trial."). This did not open the door to trying appellant for some collateral crime or for being a criminal generally. *See id.*; *Boutwell v. State*, 719 S.W.2d 164, 173, 174 (Tex. Crim. App. 1986) ("The general rule is that an accused may not be tried for some collateral crime or for being a criminal generally.") (citing *Williams v. State*, 662 S.W.2d 344 (Tex. Crim. App. 1983)).

In addition, the State also relies on the following cross-examination of Sergeant Wilson by appellant's attorney:

29

[Q.] I mean, you looked – investigation not only included this but you went seven, eight, nine years back on [appellant].

[A.] For this particular investigation no, sir.

Counsel clearly asked Sergeant Wilson about the scope of the investigation. *See Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994) (holding that extraneous evidence is admissible to rebut defensive theories raised by the State's witnesses during cross-examination). However, Sergeant Wilson denied that the investigation went as far back in time as counsel suggested. Again, neither counsel nor the witness stated that appellant had a spotless record going back ten years. *See Alexander v. State*, 476 S.W.2d 10, 11 (Tex. Crim. App. 1972) (where the defendant testified on direct examination that "he had not been in trouble before," the State on cross-examination was permitted to inquire about prior arrests for extraneous offenses to refute the defendant's blanket statement concerning his exemplary conduct).[7] On the contrary, defense counsel characterized appellant as the victim of political harassment, subject to an unduly exhaustive investigation by the State. Defense counsel asked Sergeant Wilson the following:

[Q.] When did the investigation end?

[A.] Prior to us walking in the courtroom.

[Q.] Okay. So you all were still investigating as of yesterday or what?

[A.] There were issues that occurred and that may or may not affect the punishment phase that the attorneys asked me to investigate, yes, sir.

---

[7] *See Bell v. State*, 620 S.W.2d 116, 126 (Tex. Crim. App. 1981) ("[T]he State had the right to inquire under the exception to the general rule about the arrest and conviction for possession of marihuana since the appellant had 'opened the door' on direct examination. Despite the characterization to the contrary by the panel, the question asked and answered on direct examination could not have left any other impression with the jury except that he had nothing in his criminal past except the embezzlement conviction, particularly when it was established on direct examination that this was the only time appellant had been to the 'joint' and had done well on parole.").

30

[Q.]   I'm talking about – I'm not talking about all these rabbit trails you've been chasing these last two or three months, I'm talking about the March 2, 2009 case. When did that investigation stop, yesterday?

[A.]   When I had the evidence that I needed to prove that the offense occurred.

[Q.]   Okay. It's a real simple question, Sergeant.

. . .

[Q.]   Sergeant Wilson, when did the investigation of [appellant] concerning the March 2, 2009 incident stop?

[A.]   I don't know the date of that, sir. We had enough evidence to present to the Grand Jury and presented to the Grand Jury.

The State argues that the foregoing raised a defensive theory to the effect that "the State went back ten years and could not find any evidence against [appellant]"; however, the relevant portions of the record show that counsel maintained only that the State had no evidence of the offense for which appellant was charged and that the investigation and prosecution continued nonetheless for illicit political reasons.

An alleged political vendetta is not an affirmative defense. *See Juarez v. State*, 308 S.W.3d 398, 402–03 (Tex. Crim. App. 2010) ("[A]n affirmative defense was defined, in part, as meaning a new matter, assuming the complaint to be true, which constitutes a defense to it.") (internal quotations omitted); *see also* TEX. PENAL CODE ANN. §§ 8.01–.07 (West 2011 & Supp. 2011) (general defenses to criminal responsibility). Nor does it tend to negate one or more elements of the charged offense. *See* TEX. PENAL CODE ANN. § 39.02(a)(2), (c)(2) (abuse of official capacity). Thus, it is not a defensive theory that may be rebutted by extraneous offense evidence. *See Berry v. State*, 233 S.W.3d 847, 858 (Tex. Crim. App. 2007) ("[E]xtraneous-offense evidence may be admissible

31

when a defendant raises an affirmative defense or a defensive issue that negates one of the elements of the crime.").

Furthermore, the suggestion by defense counsel that the State went back ten years "to find stuff on the defendant" is simply not the same as saying that the State went back ten years and found no evidence of other uncharged, unadjudicated crimes. Although counsel repeatedly stated that there was no evidence to prove the charged offense, he did not make any statements or suggestions concerning the results of the State's broader investigation. Thus, there was no false impression to rebut concerning appellant's criminal record or other uncharged, unadjudicated offenses during the preceding ten-year period. Accordingly, the evidence of extraneous offenses was not admissible to rebut a false impression that appellant had committed no criminal offenses in the prior ten years.

Second, the State contends that the extraneous offense evidence was admissible to rebut appellant's "donation" alibi. The record shows that the "donation" issue was introduced for the first time during the State's opening statement. The State told the jury:

> [T]he evidence will show the defendant was trying to get his barbershop demolished and hauled away for nearly free until Mr. Fugate [the Mayor of the City of Kingsville] drove by and saw this. What he ends up paying is he ends up paying Mr. Saldana $500 [for the demolition]. He ends up hiring Mr. De La Paz for hauling away the debris for $530. He ends up paying the City of Kingsville $746 [for dumping materials at the City of Kingsville's landfill]. When I say he ends up [it is] because originally he was trying to get this done for free . . . [that is, until] Mr. Fugate drove by and saw it.
>
> . . .
>
> Now, I suspect what you're going to hear from them was yes, we were over there but "I was donating concrete to the county which was being

32

placed out at Sage Road." And the State's not denying that concrete may have ended up on Sage Road, but what we're submitting to you is, this is something after the fact. This is a story they came up with and said, we'll make this work because we have to.

As a general rule, the defensive theory that the State wishes to rebut through the use of extraneous offense evidence must be elicited on direct examination by the defense and may not be elicited by "prompting or maneuvering" by the State. *See Shipman v. State*, 604 S.W.2d 182, 185 (Tex. Crim. App. 1980); *see also Lopez v. State*, 928 S.W.2d 528, 531 (Tex. Crim. App. 1996) ("[I]t is appropriate for the State to impeach appellant in order to correct a false impression left by appellant . . . . [S]uch questioning by the State can only be done when appellant has voluntarily testified to the collateral matter.").

In addition to being the first to raise the "donation" issue at trial, the State also told the jury that "donation" was not a valid alibi because even if appellant had donated the concrete, he was still guilty of misusing county vehicles and employees. In his final remarks, the prosecutor told the jury what message a guilty verdict in this case would send to Kleberg County:

> It tells future elected officials, hey, Kleberg County, I better do this legally. I've got to do this legally because are you really buying this donated concrete story? Even if you bought that story, he still got a benefit. He got the concrete taken away from his property. What if your concrete was in your front yard and someone just came and got it for free[?] [T]hat's a benefit, but he used taxpayer money, equipment, employees.

Thus, on the one hand, for purposes of seeking a guilty verdict from the jury, the State maintained that "donation" was not a valid alibi. On the other hand, in arguing for the admissibility of evidence of extraneous offenses, the State now maintains that

33

"donation" was a valid alibi that it was entitled to rebut. Clearly, both positions cannot be correct.

"The defense of alibi arises where there is evidence that appellant is at a point where he could not have been guilty of participating in the offense." *See Giesberg v. State*, 984 S.W.2d 245, 247 (Tex. Crim. App. 1998). "If a defendant wishes to rely upon alibi as his defense, he bears the duty of going forward with evidence raising an alibi in order to create a reasonable doubt of the defendant's presence at the time and place where the crime was committed." *Id.* at 248.

In this case, appellant's actual presence at the time and place where the crime was allegedly committed was not contested and not an essential part of the prosecution's case. *See* TEX. PENAL CODE ANN. § 39.02(a)(2), (c)(2) (abuse of official capacity). Moreover, donation did not make appellant's presence any more or less likely than it otherwise would be. Finally, an alibi means the defendant could not have committed an offense which occurred, while donation arguably means no offense was committed by appellant or anyone else. *See Giesberg,* 984 S.W.2d at 248 ("[A]n alibi can only create a doubt about whether the State has met its burden of proving that a defendant committed the offense where the defendant's actual presence at the time and place of the commission of the offense is an issue in the State's case."). According to the State, however, donation would not negate any element of the charged offense, and thus, it is irrelevant to appellant's guilt or innocence.

Given that the State was the first to introduce the issue of donation, and given further that the State maintained throughout trial that donation was not a valid alibi and did not negate any element of the charged offense, the evidence of extraneous offenses

34

was not admissible to rebut evidence that appellant donated the concrete at issue in this case.

Third, and finally, the State argues that the extraneous offense evidence was admissible to show appellant's intent based on multiple instances of the same culpable conduct and similar circumstances where county trucks and county personnel were misused. *See* TEX. R. EVID. 404(b).

It is well-settled that evidence of extraneous offenses may be admissible "[t]o prove scienter, where intent or guilty knowledge is an essential element of the state's case *and cannot be inferred from the act itself*." *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972) (emphasis added). Here, the State did not attempt to explain why it needed the evidence of extraneous offenses to prove intent or how that would be accomplished. *See Segundo v. State*, 270 S.W.3d 79, 88 n.19 (Tex. Crim. App. 2008) ("The key . . . is that the proponent explain precisely how the proffered evidence is probative of a fact of consequence."). In fact, the State's position throughout trial was that appellant's actions were sufficient to establish intent. As counsel stated in his closing argument:

> Now, part of that, ladies and gentleman, of course is the intentionally or knowingly. How do you determine the defendant's intent? You determine by looking at his actions. How do you determine that he intentionally or knowingly misused government property?
>
> . . .
>
> It's simple. Look at what he did that day. He tells everyone to take the county dump trucks to his residence and they do. He tells them Saldana is going to load you up and he does. Why? Because [appellant] is the boss. He said he was. They followed his orders.
>
> And where you really look to determine his intent is what he did after he found out that he was caught. That afternoon, per Saldana's testimony he

35

goes and says, "do you know someone who can haul this stuff away," that afternoon. Now, if you really believe that that after he filed a demolition permit well before that time and after he tries to get Eloy Saldana hired well before that time that he is now waiting until the afternoon of March 2, 2009, to suddenly say, I'm going to need someone to haul away this giant piece of debris outside my house. No, he didn't. He did it at that time because that's when it came up because that's when he got caught.

According to the State, intent could be inferred from appellant's actions. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) ("[I]ntent may be inferred from circumstantial evidence."). Thus, there was no need for evidence of extraneous offenses to prove intent. *See Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1991) ("It is also faithful to this Court's long tradition of determining the admissibility of extraneous offense evidence on appeal by reviewing not only the relevance of that evidence, but the State's need for it as well."); *see also Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003) ("If the issue is disputed and the proponent has no other evidence to prove the fact, then the proponent's need for the evidence is great, and that weighs in favor of admitting the evidence.").

Moreover, the State used the evidence not to prove appellant's intent, but rather, to prove conformity to bad character with respect to appellant and the witnesses who gave testimony favorable to appellant. *See Montgomery*, 810 S.W.2d at 391 ("The trial judge must conclude that the evidence tends in logic and common experience to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence.").

In its closing argument, the State told the jury the following:

What happened on March 2, 2009, wasn't anything special for Precinct 4, it was business as usual.

. . .

36

Al Soliz told you about two more instances of while he was a county employee that he used county equipment on county time and for the personal benefit of Gus De Leon, one of the same witnesses that's trying to help the defendant there, and for Sergio Bustamante, that he took dirt, county dirt and used county equipment to go out there, your taxpayers for their benefit, which benefits [appellant] because he keeps, takes care of his boys then they'll be loyal to him when he wants it done himself. They'll come and try to cover up everything for him so he's lying times two . . . .

So what we have here is that the only person that's telling the truth according to the defendant, is the defendant that's charged with a crime, Gus De Leon, and Garcia who are also his employees, who are also a party to the crime, so consider that. But everyone else, they're liars.

In the foregoing argument, the State told the jury that appellant was guilty of being in the "business" of criminal activity. *See Robbins v. State*, 88 S.W.3d 256, 263 (Tex. Crim. App. 2002) ("[The] purpose of rule [404(b)] is to protect defendant from the 'undue prejudice' that 'when evidence is received that accused is of a wicked or criminal disposition, juries are likely to find him guilty of the offense charged regardless of whether it is proved by the evidence.'") (quoting 2 Ray and Young, *Texas Law of Evidence* (2d ed., 1956), § 1492). Moreover, according to the State, this is why the defense witnesses were willing to "try to cover up everything," because they were criminals too and "party to the crime."[8] This amounted to using evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that he acted in conformity therewith. *See* TEX. R. EVID. 404(b).[9] To the extent the evidence

---

[8] Although such impeachment of witnesses is permissible under certain limited circumstances, those grounds were not urged at trial or on appeal and are therefore not before the Court. *See Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007) ("[W]hen a witness, on direct examination, makes a blanket assertion of fact and thereby leaves a false impression with respect to his prior behavior or the extent of his prior troubles with the law, he opens the door on his otherwise irrelevant past criminal history and opposing counsel may impeach him by exposing the falsehood.") (internal quotations omitted).

[9] *See Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004) ("The rule prohibits only that evidence which is offered to prove a person's character, from which the trier of fact is then to infer

proved intent, it did so by suggesting that appellant necessarily intended to commit the charged offense because he is in the "business" of crime. *See Webb v. State*, 36 S.W.3d 164, 181 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("In other words, proof of the sexual assault against Porter served no probative function other than to show appellant as a person who commits sexual assaults in general, and, therefore, was more likely to have committed the sexual assault against Baird, an inference rule 404(b) strictly forbids.").[10] The evidence of extraneous offenses was not admissible for this purpose. *See* TEX. R. EVID. 404(b).

In sum, the trial court had no discretion to admit the evidence of extraneous offenses based on any of the theories advanced by the State. *See Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008) ("In our criminal justice system, the proponent of evidence ordinarily has the burden of establishing the admissibility of the proffered evidence."). Thus, the trial court erred in admitting the evidence.

Next, we must determine whether the error is reversible. Because no constitutional error is involved when evidence of uncharged misconduct is admitted, we look to Texas Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b). Under

---

that the person acted in conformity with that character trait on the occasion in question. For example, in an injury to a child prosecution, the State might wish to offer other instances in which the defendant beat this or another child to prove he is a 'chronic child abuser.' The jury would then be invited to infer that, because the defendant is a chronic child abuser, he abused the child on this charged occasion. That is precisely the character-propensity purpose prohibited by Rule 404(b). Although this 'child abuser' character evidence is logically relevant to show the defendant committed the charged act of physical abuse, the law has, for centuries, rejected such evidence because it injects dangerous baggage of prejudice, distraction from the issues, time consumption, and hazard of surprise.") (internal citations, quotations omitted).

[10] *See id.* at 222 ("But a 'system' or 'pattern' of committing offenses by itself is exactly the forbidden inference that one who violated the [laws] on one occasion must have violated them on the occasion charged in the incident. Unless something more than pattern and temporal proximity is required, the fundamental rule is gone. That is why 'pattern' is not listed in Rule 404(b) as an exception. Patterns of acts may show identity, intent, plan, absence of mistake, or one of the other listed grounds, but a pattern is not itself a reason to admit the evidence.") (citing *Owens v. State*, 827 S.W.2d 911, 916 (Tex. Crim. App. 1992)).

Rule 44.2(b), reviewing courts should disregard any error that did not affect the appellant's substantial rights. *Id.*; *see also King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) ("A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict."). "Such error is harmless if the reviewing court, after examining the record as a whole, is reasonably assured the error did not influence the jury verdict or had but slight effect." *Rivera-Reyes v. State*, 252 S.W.3d 781, 787 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

"When an appellate court determines that a jury's verdict was substantially influenced by the improper admission of substantively inadmissible Rule 404(b) evidence, that influence on the jury's verdict will always be 'injurious' since there was no proper purpose for the jury to consider the evidence." *Hernandez v. State*, 176 S.W.3d 821, 825 (Tex. Crim. App. 2005).

In this case, the improper use of extraneous offense evidence included arguments by the State that appellant should be found guilty of the charged offense because he and his employees are in the "business" of criminal activity. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) ("The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable."). The State suggested that the jury should reject appellant's testimony on this basis. The State also argued that De Leon and Garcia testified falsely and that the evidence of extraneous offenses provided their motive for doing so, even though Garcia was not even implicated by those allegations. The State told the jury, "[Appellant] takes care of his boys . . . [so] they'll be loyal to him.

They'll come and try to cover up everything for him." This was "inflammatory," "misleading," and "confusing." *See id.* It was "emotionally charged" to a degree that would "prevent the jury from rationally considering the evidence before it." *Id.*

In reviewing the sufficiency of the evidence in connection with appellant's first and second issues, we noted that, as the finder of fact, the jury was free to disbelieve appellant's testimony and to reject the other evidence favorable to appellant. We did not find the evidence of guilt to be overwhelming; rather, the sufficiency of the evidence hinged on the jury's assessment of the credibility and weight to be given to appellant's testimony. In overruling appellant's first and second issues, we deferred to the jury's assessment of the credibility and weight to be given to appellant's testimony. Nevertheless, in this context, we observe that the State's use of extraneous offense evidence was calculated to substantially influence the jury's assessment of the credibility and weight to be given to appellant's testimony, as well as the other evidence favorable to appellant. Because the sufficiency of the evidence hinged on that assessment by the jury, we conclude that the evidence of extraneous offenses had a substantial and injurious effect or influence in determining the jury's verdict.

Accordingly, we conclude that the jury's verdict was substantially influenced by the improper admission of extraneous offense evidence. *See Robbins v. State*, 88 S.W.3d 256, 263 (Tex. Crim. App. 2002) ("[The] tendency of human nature to punish, not because our [defendant] is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury.") (quoting 1 WIGMORE, EVIDENCE (3d ed., 1940), § 57). We conclude that the extraneous offense evidence and arguments based on that evidence influenced the

40

outcome and affected the fundamental fairness of the trial in this particular case. *See Boutwell v. State*, 719 S.W.2d 164, 173 (Tex. Crim. App. 1986) ("Where the improper use of such extraneous acts in the context of the instant case might well have influenced the outcome and affected the fundamental fairness of the trial in this particular case, we feel compelled to address the issue."). Accordingly, the error is reversible. *See* TEX. R. APP. P. 44.2(b).

Appellant's fourth issue is sustained.

### V. CONCLUSION

The judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed the
6th day of June, 2013.